**LODGE 1858, AMERICAN FEDERA-
TION OF GOVERNMENT EM-
PLOYEES, et al., Appellants,**

v.

**Thomas O. PAINE, Administrator, Na-
tional Aeronautics and Space Admin-
istration, et al., Appellees.**

**No. 22006.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 17, 1969.

Decided April 21, 1970.

Mr. Edward L. Merrigan, Washington, D. C., for appellants.

Mr. Ralph A. Fine, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Edwin

L. Weisl, Jr., and Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for governmental appellees.

Mr. Paul A. Porter, Washington, D. C., for appellee, National Council of Technical Service Industries.

Before BURGER,* TAMM and ROBINSON, Circuit Judges.

PER CURIAM:

Judge Tamm and Judge Robinson file separate opinions. Judge Tamm concurs in the result reached by Judge Robinson in his opinion. The judgment appealed from is vacated, and the case is remanded to the District Court for further proceedings.

So ordered.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

█ This appeal follows upon the District Court's dismissal of an action challenging demotions and discharges of civil service employees integrally with a reduction in force by the National Aeronautical and Space Administration (NASA) at its George C. Marshall Space Flight Center (Marshall) in Huntsville, Alabama. Appellants are six of the civil servants whose employment was altered by the reduction in force,[1] and Lodge 1858, American Federation of Government Employees (the Union), suing in its own right and on behalf of all affected civil service jobholders at Marshall, whom it represents as exclusive bargaining agent.[2] Appellees are the Administrator of NASA,[3] the members of the Civil Service Commission,[4] and the National Council of Technical Service Industries (NCTSI), a nonprofit corporation with a membership of companies supplying personnel pursuant to contracts with various federal agencies, including NASA.[5]

The gravamen of appellants' action is that NASA has bypassed controlling congressional enactments by procuring, through its service support contracts with private firms, manpower outside the civil service to perform tasks assigned by law to federal civil servants only. Their complaint charges that NASA, in curtailing its work force at Marshall, demoted some civil service employees and discharged others, while retaining in their preexisting positions contractor employees engaged in the same or similar activities. This, the complaint says, violated legislation restricting NASA's hir-

* Circuit Judge (now Chief Justice) Burger did not participate in the disposition of this case.

1. All six were slated for separation from government service when the reduction in force was first announced. The record leaves unclear the extent, if any, that their individual situations may have improved in consequence of subsequent ameliorating developments. See notes 16, 20, 23, infra.

2. The Union, a chartered lodge of the American Federation of Government Employees, is an organization of civil service employees at Marshall, and is a party to a collective bargaining agreement with Marshall formulated pursuant to Exec. Order No. 10988, 3 C.F.R. 521 (1964). By the agreement, Marshall is designated a single bargaining unit, and the Union as sole bargaining agent for all jobholders in civil service there who are embraced within its coverage.

3. NASA is an independent agency of the Federal Government. 42 U.S.C. §§ 2472 et seq. (1964). It is headed by its Administrator who, under supervision and direction of the President, is "responsible for the exercise of all powers and the discharge of all duties of the" agency, and has "authority and control over all personnel and activities thereof." 42 U.S.C. § 2472(a) (1964).

4. Successors to public officials who were named as original parties to the action but who are no longer in office are properly here as appellees. Fed.R.Civ.P. 25 (d) (1); Fed.R.App.P. 43(c) (1).

5. It has been estimated that the Federal Government annually secures from the private sector support services costing $8.5 billion and involving more than 250,000 contractor employees, as compared with $11.5 billion annually expended for services rendered under the civil service laws. H.R.Rep. No. 1850, 90th Cong., 2d Sess. 5 (1968).

ing of contractor personnel,[6] the civil service laws and implementing regulations,[7] and the Union's collective bargaining agreement with NASA.[8] The complaint seeks declarations that, under these circumstances, the demotions and discharges of civil service employees are prohibited and the service support contracts are illegal, and injunctive relief with regard to each.

For further details, I look to the now dismissed complaint, the factual allegations of which must be accepted as true for purposes of this appeal.[9] At the end of 1966, NASA had approximately 7,300 civil service employees at Marshall and, in addition, a dozen private concerns supplied some 5,900 contractor employees in a variety of job classifications.[10] Congress has ordained, subject to certain exceptions,[11] that "officers and employees as may be necessary to carry out [NASA's] functions * * * shall be appointed in accordance with the civil-service laws * * *."[12] Marshall's contractor employees allegedly work on NASA property with NASA equipment side by side under common governmental supervision with civil service employees on exclusively NASA tasks that are identical or substantially so.[13] On this basis, appellants contend that nongovernment personnel work in direct job competition with government personnel at Marshall, and in direct violation of law.[14]

6. See note 12, infra.

7. See notes 39, 92, 93, infra.

8. See note 2, supra.

9. Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); Polk Co. v. Glover, 305 U.S. 5, 9, 59 S.Ct. 15, 83 L.Ed. 6 (1938); Pauling v. McElroy, 117 U.S.App.D.C. 372, 373–374, 278 F.2d 252, 253–254, cert. denied, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed. 2d 60 (1960); Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp., 84 U.S.App.D.C. 275, 283, 173 F.2d 416, 423 (1949). Although my disposition of this appeal is governed by that rule, I resort occasionally, for comment only, to other informational sources since the record indicates that critical allegations of the complaint would become subjects of dispute in the event of trial on the merits.

10. By NASA's statistics, as the result of a decline since 1966 in projects assigned to Marhall, its civil service work force decreased to 7,266 in fiscal year 1966, to 7,179 in fiscal year 1967, and to a projected 6,386 in January, 1968. Contractor support at Marshall also decreased from an estimated 6,044 in fiscal year 1965 to an estimated 5,813 in fiscal year 1966, to an estimated 5,633 in fiscal year 1967, and to an estimated 4,595 in January, 1968.

11. See note 12, infra.

12. "In the performance of its functions the Administration is authorized * * * to appoint and fix the compensation of such officers and employees as may be necessary to carry out such functions. Such officers and employees shall be appointed in accordance with the civil-service laws and their compensation fixed in accordance with the Classification Act of 1949, except that (A) to the extent the Administrator deems such action necessary to the discharge of his responsibilities, he may appoint not more than four hundred and twenty-five of the scientific, engineering, and administrative personnel of the Administration without regard to such laws, and may fix the compensation of such personnel not in excess of the highest rate of grade 18 of the General Schedule of the Classification Act of 1949, as amended, and (B) to the extent the Administrator deems such action necessary to recruit specially qualified scientific and engineering talent, he may establish the entrance grade for scientific and engineering personnel without previous service in the Federal Government at a level up to two grades higher than the grade provided for such personnel under the General Schedule established by the Classification Act of 1949, and fix their compensation accordingly * * *." 42 U.S.C. § 2473(b) (2) (1964).

13. Appellants' allegations thus appear to be geared to criteria for determining federal employment which have been developed by the Department of Labor and the Civil Service Commission, H.R.Rep. No. 188, 89th Cong., 1st Sess. 7 (1965), and generally concurred in by the General Accounting Office, id. at 2.

14. In defense of the legality of NASA's service support contracts, NCTSI resorts to 42 U.S.C. § 2473(b) (5) (1964),

/

The complaint also informs us that in the recent past the Civil Service Commission and the General Accounting Office have criticized some of NASA's service support contracts as illegal and wasteful.[15] It informs additionally that NASA responded with a pledge of rectification but that, before taking any action in reference to the Marshall contracts, it announced that budgetary cuts necessitated reduction of its force of civil servants there,[16] whereupon many, including the six individual appellants, were notified that they would either be separated from federal service or assigned to inferior positions at reduced rates of pay. The complaint avers that these appellants had served long and satisfactorily, but were subjected to the reduction in force although in each instance contractor employees performing substantially the same work were retained in their positions without any loss of pay whatsoever.[17]

Appellants sought relief against the reduction in force from NASA's Administrator, and then from the Civil Service Commission, requesting its intercession in the matter. The Commission replied that it was powerless to act because "NASA is solely responsible." The individual appellants and other affected civil service employees thereupon initiated appeals with the Commission's Atlanta Regional Office. Before rendition of any decision on the appeals, appellants filed their complaint in the District Court and moved for a preliminary injunction against the reduction in force.

At the hearing on the motion, the District Judge expressed concern that NASA's service support contracts might be out of tune with governing statutes, but found that NASA and the Civil Service Commission were cooperating in efforts to reconcile NASA's operational needs and its service support contract practices with legal requirements and Commission policies under the civil service laws.[18] To maintain the status quo during that endeavor, the judge granted the requested injunction, but with a pro-

and other legislative and judicial sources. Since I do not, on this appeal, deal with the merits, I have no occasion to consider those materials.

15. Comptroller General, Report on Potential Savings Available Through Use of Civil Service Rather Than Contractor-Furnished Employees for Certain Support Services, B–133394 (June 9, 1967); Comptroller General, Report on Violation of Statutes Governing Federal Employment and Excess Costs Incurred Under a Contract for Technical Writing and Related Services Awarded by the Goddard Space Flight Center, B–133394 (Oct. 19, 1964); General Counsel, Civil Service Commission, Opinion on Legality of Selected Contracts at the Goddard Space Flight Center, National Aeronautics and Space Administration (Oct. 1967).

16. The complaint alleges a proposal to eliminate approximately 640 civil service jobs and to lower an unspecified number of civil service employees in position. NASA's statistics are fuller and somewhat variant. The agency's overall civil service personnel ceiling would be trimmed by approximately 1,700 from 34,126 to 32,422, and the ceiling at Marshall would be cut by 700 to 6,386. In contemplation for Marshall, after subtracting voluntary resignations and retirements, were 560 separations, 300 reductions in grade, and reassignment offers to 260 other civil servants. However, as hereinafter appears, see notes 20, 23, infra, the reduction in force at Marshall eventuated as something much less drastic.

17. NASA claims a reduction by 400 in contractor employees during the last seven months of 1967, and a projected additional cut by approximately 1,000 by the end of fiscal year 1968. NASA also asserts that it is unaware of any instance at Marshall where civil service employees are working side by side with contractor employees performing the same duties.

18. The District Judge also found that NASA was itself in process of evaluating its operations at Marshall with a view to insuring that no civil service employee would be separated or reduced in grade or pay by reduction in force actions while nongovernmental employees performing the same activities continued to work on site at Marshall under service contracts then currently in effect with private contractors. The judge further found that Marshall's management, in cooperation with the Civil Service Commission, had established a positive out-placement program the primary purpose of which was

viso for its dissolution in the event that the two agencies reached an accord. NCTSI, the nongovernmental appellee, was permitted, over objection by NASA and appellants, to intervene for the purpose of defending its members' contracts with NASA.[19]

Shortly thereafter, NASA and the Commission agreed that the great majority of the proposed demotions and separations should be canceled,[20] and that the remaining personnel actions appeared tentatively to be legal.[21] Appellants disagreed with the latter conclusion, but the judge dissolved the injunction without prejudice to any administrative remedies possessed by the individual employees,[22] and later granted NASA's motion to dismiss.[23] The grounds stated for dismissal were non-exhaustion of remedies open to the individual appellants before the Civil Service Commission, and non-reviewability of demotions in and separations from the civil service save on judicial examination of Commission action after exhaustion of such remedies.[24]

Appellants challenge the dismissal, and urge a reversal and a remand in order that the District Court may hear and determine the litigation on the merits. Appellees argue that dismissal was proper, not only for non-exhaustion of administrative remedies[25] but also for lack of individual or organizational standing to question NASA's deployment of contractor personnel,[26] an issue which, as I analyze the case, must be reached.[27] I conclude in appellants' favor on standing,[28] and find it unnecessary to resolve the exhaustion issue.[29]

## I

I consider first the contention that the Union and the individual appellants are without standing to litigate the issues the resolution of which is central to the disposition appellants seek on the merits. NASA takes the position that the Union lacks standing to press any viewpoint on the case. NCTSI argues that neither the Union nor the individual appellants have standing to assert the il-

to place separated civil service employees in other positions within the NASA organization.

19. See note 84, *infra*.

20. The agreement furnished approximations in this connection. Of 764 outstanding separation and reduction in grade notices, all but 166 were to be canceled. Of the 166 not canceled, 56 would involve separation and 110 reductions in grade. About 150 wage board employees who received reduction in force notices would be retained for retraining for placement at Marshall, and 69 technicians who received separation notices would be offered reassignment elsewhere within NASA at the same grades and to comparable positions with payment of moving expenses. The NASA-Commission agreement also specified that all affected employees would be accorded their full rights under civil service reduction in force regulations. See also note 23, *infra*.

21. Agreement was reached "concerning broad principles to be applied in connection with the reduction-in-force at [Marshall] which eliminates any probable involvement of improper service contract operations as they may affect that reduction-in-force; * * *."

22. No appeal was taken from this action.

23. At that time, a total of about 600 reduction in force notices had been canceled, leaving outstanding 21 separations, 82 demotions, and 82 reassignments without substantial injury to the employees.

24. In the latter connection, the District Judge stated that "the Court may not enjoin a Government agency from discharging any of its employees, nor may it issue a declaratory judgment." Appellees do not press this argument on appeal. See, however, note 69, *infra*.

25. Appellees do not argue non-reviewability as a point separate from non-exhaustion of administrative remedies. See, however, note 69, *infra*.

26. In the District Court, NASA contested the Union's standing, and NCTSI the standing of the Union and the individual appellants as well. It is apparently because the District Judge disposed of the motion to dismiss on other grounds that he did not deal with the standing questions.

27. Part I, *infra*.

28. Parts II, III, *infra*.

29. Part IV, *infra*.

legality or inefficacy, as against civil service jobholders, of the service support contracts its member companies have made with NASA.[30] My treatment of the problems starts with identification of the precise role those contracts play in the controversy appellants have submitted for judicial determination.

The essence of appellants' claim is that federal statutes, civil service regulations and the Union's collective bargaining agreement with NASA invalidate the service support contracts or at least, when reductions in force are undertaken, confer preference rights on civil service employees vis-a-vis contractor employees doing similar work. The gist of the countervailing argument is that appellants' complaint comes ultimately to an assault on NASA's service support contracts with outside concerns, which appellants have no standing to maintain.

Undeniably, the complaint launches a major attack on the legality of the contracts, and the relief sought would in one aspect consist in a declaration and injunction outlawing them. Even assuming NASA's authority to enter into such contracts, a matter I do not address on this appeal, there would remain for judicial decision the question whether federal civil servants have job retention rights superior to those of competing nonfederal employees. Appellants' complaint thus inevitably draws the efficacy of the service support contracts into the maelstrom of the controversy, and the standing issue is brought into sharp focus as a query as to whether appellants may assail the contracts by which non-civil service manpower is procured for Marshall.[31]

The argument against standing is pitched on the premise that appellants have no legally safeguarded right to freedom from governmental action creating employment competition for them. Of course, neither the Union nor the individual appellants are parties to the service support contracts, nor are they affected by the contracts otherwise than by the economic consequences wrought. Injury resulting from rivalry over jobs, it is urged, is not enough; appellants, it is claimed, must demonstrate that the action complained of constitutes an invasion of interests commanding legal protection.

There is a well known body of precedent supporting the proposition that standing is lacking "unless the right invaded is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." [32] Indeed, to be found among our own past decisions are holdings seemingly requiring a legally protected right as a condition precedent to achieving standing.[33]

30. Since I conclude that NCTSI was properly allowed to intervene, and that it has standing to defend the legality of the service support contracts with NASA, see note 84, *infra*, its argument against the standing of the individual appellants is entertained although its co-appellees do not subscribe to it.

31. As this analysis reveals, appellants' complaint framed the action, not merely as a sought after judicial review of the then unfinished administrative proceedings before the Civil Service Commission, but as an original wholesale attack upon the service support contracts in their relation to the reduction in force at Marshall.

32. Tennessee Elec. Power Co. v. TVA, 306 U.S. 118, 137, 59 S.Ct. 366, 83 L.Ed. 543 (1939). Other cases NCTSI relies on include Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); Alabama Power Co. v. Ickes, 302 U.S. 464, 479, 58 S.Ct. 300, 82 L.Ed. 374 (1938).

33. *E. g.*, Pennsylvania R. R. v. Dillon, 118 U.S.App.D.C. 257, 259–260, 335 F.2d 292, 294–295, cert. denied, American-Hawaiian S. S. Co., 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964); Benson v. Schofield, 98 U.S.App.D.C. 424, 427, 236 F.2d 719, 722 (1956), cert. denied, 352 U.S. 976, 77 S.Ct. 363, 1 L.Ed.2d 324 (1957); Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 281–282, 225 F.2d 924, 932–933, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). See also Texas State AFL-CIO v. Kennedy, 117 U.S.App.D.C. 343, 345, 330 F.2d 217, 219, cert. denied, 379 U.S. 826, 85 S.Ct. 54, 13 L.Ed.2d 36 (1964).

Appellants have not pointed to any specific source, nor have I been able to detect any, from whence one could say, without assaying the case on the merits, that such a right in their favor clearly and unquestionably springs.[34]

Canvassing the complaint for possibilities, I note initially the Union's collective bargaining agreement with NASA, but on examination find reason for pause. This compact was promulgated under Executive Order 10988,[35] which requires a provision in all such agreements that "[m]anagement officials of the agency retain the right, in accordance with applicable laws and regulations, * * * (b) to hire * * * and retain employees in positions within the agency, and * * * (c) to relieve employees from duties because of lack of work or for other legitimate reasons. * * * "[36] The agreement in suit contains this language, and none to the contrary, so that, related problems aside,[37] there is an immediate confrontation with the question whether Marshall's civil service employees have greater rights than they would derive from the "applicable laws and regulations." Only by proceeding to decide on the merits whether the collective agreement is so limited could it be ascertained whether a

legally protected right is created by the agreement itself.[38]

I look next for laws and regulations explicitly conferring standing, and the complaint refers merely to statutory provisions specifying certain retention preferences among "competing employees."[39] Again there is cause for hesitation, arising from congressional delegation to the Civil Service Commission of the task of implementing those provisions,[40] and the concomitant question whether initial resort to the Commission's administrative processes is a condition to their judicial consideration.[41] While Marshall's adversely affected civil service employees could undoubtedly invoke such provisions on individual reviews of Commission determinations,[42] appellants embarked upon their quest for relief against the service support contracts without awaiting prior action by the Commission, and have insisted throughout upon the propriety of that course. Only by treating the statute and regulations on the merits could one deal with this potential hurdle to "legally protected right" standing.

This case thus illustrates a difficulty all too frequently encountered in undertakings to rule on standing by application of the "legally protected right" test. Identification of such a right may neces-

34. Appellants' response to the contention that they lack standing is simply that, without more, they are entitled to litigate their claim that the service support contracts afford "unlawful competition." This position would thus also postulate the standing issue on the dichotomy between "lawful" and "unlawful" competition, see Alabama Power Co. v. Ickes, *supra* note 32, 302 U.S. at 484, 58 S.Ct. 300, a significance which only a probe into the merits could develop.

35. 3 C.F.R. 521 (1964).

36. Exec. Order No. 10988 § 7(2), 3 C.F.R. 525 (1964).

37. *Compare* United Fed'n of Postal Clerks, AFL-CIO v. Watson, 133 U.S.App.D.C. 176, 183 n. 22, 409 F.2d 462, 469 n. 22, cert. denied, Blount v. United Federation, 396 U.S. 902, 90 S.Ct. 212, 24 L.Ed.2d 178 (1969).

38. Other difficult questions are inextricably bound up with any consideration to

be given the collective bargaining agreement. Compare United Fed'n of Postal Clerks, AFL-CIO v. Watson, *supra* note 37, 133 U.S.App.D.C. at 183 n. 22, 409 F.2d at 469 n. 22. See also National Ass'n of Internal Revenue Employees v. Dillon, 123 U.S.App.D.C. 58, 356 F.2d 811 (1966); Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (1965), cert. denied, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Forkosch, Executive Order 10988: The Sovereign's Immunity, 22 N.Y.U.Intra.L.Rev. 1 (1967).

39. 5 U.S.C. § 3502(b) (Supp. IV 1969).

40. See Elder v. Brannan, 341 U.S. 277, 71 S.Ct. 685, 95 L.Ed. 939 (1951); Hilton v. Sullivan, 334 U.S. 323, 68 S.Ct. 1020, 92 L.Ed. 1416 (1948).

41. See text *infra* at notes 86–96.

42. See Administrative Procedure Act §§ 10 (a), (c), (e), 5 U.S.C. §§ 702, 704, 706 (Supp. II 1965–66).

sitate a full investigation and decision on the merits, the party's standing to litigate which is the question at the threshold. A threshold resolution on standing via a "legally protected right," even if otherwise proper,[43] may have to forego the values that only close scrutiny on the merits can provide. Such is the case here, where satisfaction of the "legally protected right" standard is not immediately apparent but thorough consideration on the merits might develop not only the outcome advocated by appellants but also their standing in terms of that standard.

It so happened, however, that quite fortuitously a rescue from that dilemma was provided. While this appeal was pending resolution, a rehearing by the court *en banc* was ordered in a case, Curran v. Laird,[44] wherein a principal question was the continuing potency of the doctrine preconditioning standing to sue on the existence of a legally protected right. With that question, so crucial to this appeal, destined for settlement by the court as a whole, decision in the case at bar was deferred to enable an evaluation of appellants' standing in accordance with the principles *Curran* would enunciate.[45] I am also benefited greatly by even more recent opinions wherein the "legally protected right" criterion was further examined and assessed.[46] Now, with the much needed enlightenment those decisions afford, I am able to proceed confidently to a definitive conclusion on the standing issues at hand.

## II

In Curran v. Laird,[47] the president of the National Maritime Union sued on behalf of its members to enforce a provision of the Cargo Preference Act[48] requiring utilization of American flag ships in preference to foreign ships in the transportation of military supplies.[49] It was held that he had standing to do so despite the absence of a perceptible "legally protected right," in the traditional sense,[50] either in the Union or the seamen comprising its membership. Recognizing that "[t]he * * * expansion of judicial review" by the Administrative Procedure Act[51] "intermeshes with and reenforces a judicial trend liberalizing standing through discernment of a protected interest,"[52] but

---

43. See text *infra* at note 68.

44. 136 U.S.App.D.C. 280, 420 F.2d 122 (1969).

45. As later discussed, Part IV, *infra*, a decision on appellees' claim that administrative remedies were not exhausted does not dispense with the need for a ruling on their contentions respecting appellants' standing.

46. Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Scanwell Laboratories v. Shaffer, 137 U.S.App. D.C. 371, 424 F.2d 859 (1970).

47. *Supra* note 44.

48. 70A Stat. 146 (1956), 10 U.S.C. §§ 2631, 2632 (1964).

49. 10 U.S.C. § 2631 (1964).

50. See text *supra* at note 32.

51. 5 U.S.C. §§ 701–06 (1964). Two sections of the Act have principal importance in this connection. One, Section 10(a),

provides that not only "[a] person suffering legal wrong because of agency action," but also one "adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (Supp. II 1965–66). See Association of Data Processing Serv. Organizations v. Camp, *supra* note 46, 397 U.S. at 153, 90 S.Ct. at 830. The other, Section 10 (c), provides for judicial review, not only of "[a]gency action made reviewable by statute," but also of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (Supp. II 1965–66). As is apparent, these sections establish criteria bearing on both a litigant's standing and judicial reviewability of the subject matter he seeks to litigate. See also note 69, *infra*.

52. Curran v. Laird, *supra* note 44, 136 U.S.App.D.C. at 283, 420 F.2d at 125. Reference was also made to pertinent observations in Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), discussed *infra* note 69.

that "[t]he area where the judicial liberalization of standing has made least headway relates to actions by one competitor complaining of another's lack of authority,"[53] the Supreme Court's decision in Hardin v. Kentucky Utilities Company[54] became pivotal. There, in supporting a private utility's standing to test the Tennessee Valley Authority's expansion of its service area, the Court applied the rule[55] "that when the particular statutory provision invoked * * * reflect[s] a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision."[56] This court summarized the governing principles as follows:

* * * [A] person aggrieved in fact may properly invoke not only the letter of the Administrative Procedure Act and its 'generous'[57] review provisions, but a broad conception that Congress is 'hospitable'[58] to the maintenance of complaints against officials charged with disregarding its substantive mandate. And it does appear that in the absence of a contrary indication the courts will entertain even an action brought by an aggrieved competitor if there can fairly be attributed to Congress, expressly or impliedly, a purpose of protecting competitive interests like those of complainants.[59]

Upon examination of the Cargo Preference Act against this doctrinal backdrop, the congressional objectives inspiring the choice of American flag vessels over foreign vessels on military freightage were isolated. One was to promote the vitality and emergency availability of American ships and crews. Another, more important to the litigation, was to provide employment protection for American seamen since, by reason of other legislation,[60] American ships must car-

53. Curran v. Laird, *supra* note 44, 136 U.S.App.D.C. at 283, 420 F.2d at 125.

54. 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).

55. Supported by Chicago Junction Case, 264 U.S. 258, 267–268, 44 S.Ct. 317, 68 L.Ed. 667 (1924); Alton R. R. v. United States, 315 U.S. 15, 19, 62 S.Ct. 432, 86 L.Ed. 586 (1942); Chicago v. Atchison, T. & S. F. R. R., 357 U.S. 77, 83, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).

56. Hardin v. Kentucky Utils. Co., *supra* note 54, 390 U.S. at 6, 88 S.Ct. at 654. The Court held that "[s]ince [the private utility] is * * * in the class which [the statute allegedly violated] is designed to protect, it has standing under familiar judicial principles to bring this suit, * * *—and no implicit statutory provision is necessary to confer standing." 390 U.S. at 7, 88 S.Ct. at 655. The Court, referring to Railroad Co. v. Ellerman, 105 U.S. 166, 26 L.Ed. 1015 (1882); Alabama Power Co. v. Ickes, *supra* note 32; Tennessee Elec. Power Co. v. TVA, *supra* note 32; and Perkins v. Lukens Steel Co., *supra* note 32, on some of which NCTSI relies, see note 32 *supra*, acknowledged that it had "repeatedly held that the economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations," but pointed out that "competitive injury provided no basis for standing in the above-cases simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury." 390 U.S. at 5–6, 88 S.Ct. at 654. The Court similarly distinguished our decision in Kansas City Power & Light Co. v. McKay, *supra* note 33, on the ground that it "ruled that an explicit statutory provision was necessary to confer standing because of the 'long established rule' that an injured competitor cannot sue to enforce statutory requirements not designed to protect competitors. In the case of statutes concerned with protecting competitive interests, the 'long established rule' is of course precisely the opposite." 390 U.S. at 7, 88 S.Ct. at 655 n. 7. See, to the same effect, Curran v. Laird, *supra* note 44, 136 U.S.App.D.C. at, 284, 420 F.2d at 126.

57. See Shaughnessy v. Pedreiro, 349 U.S. 48, 51, 75 S.Ct. 591, 99 L.Ed. 868 (1955).

58. *Id.*

59. Curran v. Laird, *supra* note 44, 136 U.S.App.D.C. at 284, 420 F.2d at 126 (footnotes not in original).

60. See *id.* at 285, 420 F.2d at 127.

ry American crews. That, it was held, was enough to enable the Union to complain of a disregard of the cargo preference requirements.

■ One is bound to spot instantly a striking parallel between *Curran* and the instant case. The National Maritime Union was aggrieved by the failure to make maximum use of American flag vessels, and thus to expand employment opportunities for the Union's members who would man those vessels. Similarly, in this case, the Union and its members—all civil service employees—are aggrieved by NASA's policies respecting the hiring of contractor employees and the retention preferences allegedly accorded them on reductions in force. Stripping appellants' claim down to one of economic injury from unlawful competition, and irrespective of the consequent aggrievement in fact to alone confer standing,[61] Marshall's federal civil servants here, no less than the Union's seamen in *Curran,* have standing to challenge the contracts giving rise to that competition where the scheme of the statute on which the challenge is based reflects a legislative purpose to protect their competitive interests.[62]

When Congress created NASA and authorized it "to appoint and fix the compensation of such officers and employees as may be necessary to carry out such functions," it mandated explicitly that "[s]uch officers and employees shall be appointed in accordance with the civil-service laws."[63] Even to give NASA a degree of flexibility in staffing, Congress has excepted but 425 of the many thousands of NASA jobs[64] from the civil service laws.[65] And while thus so overwhelmingly subjecting NASA to the civil service laws, Congress has specifically rejected Administration requests that the federal salary laws be waived for all officers and employees of the new agency.[66]

It remains for this litigation on the merits to define the degree to which twin goals in enacting this legislation may have been to restrict outside hiring by NASA and, by the same token, to confer employment benefits upon civil service personnel in the NASA organization.[67] The problem is standing, and *Curran* teaches that standing is no longer to depend upon a threshold identification of a right irrefutably demanding legal vindication. And since *Curran* was decided, the Supreme Court has taught much the same lesson:

> The 'legal interest' test goes to the merits. The question of standing is different. It concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is argu-

61. I do not reach that question here. See, however, Scanwell Laboratories v. Shaffer, *supra* note 46.

62. With complaining parties otherwise having standing, the Article III jurisdictional requirement of a "case" or "controversy" is met here, and appellees do not urge the contrary. I think it clear that appellants have "a personal stake in the outcome of the controversy," Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and that "the dispute touches upon 'the legal relations of parties having adverse legal interests.'" Flast v. Cohen, *supra,* 392 U.S. at 101, 88 S.Ct. at 1953, quoting Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). By the same

token, it seems evident that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen, *supra,* 392 U.S. at 101, 88 S.Ct. at 1953.

63. See note 12, *supra.*

64. See note 16, *supra.*

65. 42 U.S.C. § 2473(b) (2) (1964), quoted *supra* note 12.

66. See H.R.Rep. No. 1770, 85th Cong., 2d Sess., at 18 (1958) ; H.R.Rep. No. 1170, 87th Cong., 1st Sess., at 7–9 (1961).

67. Of course, any interpretative reconciliation of 42 U.S.C. § 2473(b) (2) with 42 U.S.C. § 2473(b) (5) and other legislation relied on by NCTSI must similarly await the District Court's consideration of the case on the merits.

ably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.[68]

■■ By my appraisal, the congressional mandate limiting NASA's employment of contractor employees arguably brings its civil service employees within the zone of interests it protects, and bestows standing upon the individual appellants to contest the legality of NASA's implementation of its work force at Marshall through service support contracts.[69]

## III

■ I find, too, standing in the Union to enter the contest as the representative of its members authorized to safeguard their employment interests. As quite lately we observed, "courts have come increasingly to recognize the standing of associations to raise in some circumstances the rights of their members," [70] and this they have done as well where the members' interests were statutory in origin [71] as where they were founded on a

---

68. Association of Data Processing Serv. Organizations v. Camp, *supra* note 46, 397 U.S. at 153, 90 S.Ct. at 830. See also Flast v. Cohen, *supra* note 62, 392 U.S. at 99–100, 88 S.Ct. 1942.

69. Unlike the District Court, see note 24, *supra*, I detect no encounter with the doctrines of judicial non-reviewability and sovereign immunity.

 As to the former, I draw upon the Supreme Court's delineation in Abbott Laboratories v. Gardner, *supra* note 52, 387 U.S. at 140–141, 87 S.Ct. at 1511:

 [A] survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress. * * * Early cases in which this type of judicial review was entertained, *e. g.* Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733, have been reinforced by the enactment of the Administrative Procedure Act, which embodies the basic presumption of judicial review to one "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, so long as no statute precludes such relief or the action is not one committed by law to agency discretion, 5 U.S.C. § 701(a). The Administrative Procedure Act provides specifically not only for review of "[a]gency action made reviewable by statute" but also for review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Adminis-

trative Procedure Act's "generous review provisions" must be given a "hospitable" interpretation. * * * Again in Rusk v. Cort, [369 U.S. 367, 379–380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962)], the Court held that only upon a showing of "clear and convincing evidence" of a contrary legislative intent should the courts restrict access to judicial review. See also, Jaffe, Judicial Control of Administrative Action 336–359 (1965) (footnote omitted).

 I have discovered no such evidence, and it goes without saying that NASA has no discretion in the area mandated by 42 U.S.C. § 2473(b) (2), quoted *supra* note 12, the scope of which is yet to be determined. Compare Association of Data Processing Serv. Organizations v. Camp, *supra* note 46, 397 U.S. at 157, 90 S.Ct. at 831; Barlow v. Collins, *supra* note 46, 397 U.S. at 165, 90 S.Ct. at 837; Scanwell Laboratories v. Shaffer, *supra* note 46, 137 U.S.App.D.C. at 386, 424 F.2d at 874.

 As to sovereign immunity as a bar to appellants' maintenance of this action, I need only refer to our recent decision in Scanwell Laboratories v. Shaffer, *supra* note 46, at 385–86, 424 F.2d at 873–874. There we held that the Government's immunity from suit is waived in situations where, by virtue of the Administrative Procedure Act, judicial review of administrative action is permitted.

70. United Fed'n of Postal Clerks, AFL–CIO v. Watson, *supra* note 37, 133 U.S. App.D.C. at 183, 409 F.2d at 469 (footnote omitted).

71. *Id.*; Citizens Ass'n of Georgetown v. Simonson, 131 U.S.App.D.C. 152, 153, 403 F.2d 175, 176 (1968), cert. denied, 3259 M Street, Inc. v. Citizens Ass'n, 394 U.S. 975, 89 S.Ct. 1454, 22 L.Ed.2d 755 (1969); MacArthur Liquors, Inc. v. Palisades Citizens Ass'n, 105 U.S.App. D.C. 180, 182, 265 F.2d 372, 374 (1959).

constitutional predicate.[72] Here, in the Union's relationship with its members, are the ingredients that make for organizational standing to litigate in the members' behalf the dispute at hand, with or without the presence of individual members as parties to the litigation.

■ Organizational representatives, like their constituents were they themselves prosecuting the action alone, must survive the exactions of the "case or controversy" requirement.[73] "Where the principle of avoidance of constitutional issues is not involved," we have said, "the primary requisite for a grant of standing is an interest sufficient to insure that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor."[74] Organizational representation, we added, is calculated to produce the intelligent, vigorous, adversary representation of interests required when the "association is an authorized spokesman organized to promote these interests for its individual members."[75] And "[i]n such cases, absent evidence to the contrary, it is reasonable to assume that the representative speaks effectively for his constituency."[76]

Lately, in United Federation of Postal Clerks, AFL-CIO v. Watson,[77] we had occasion to apply these standards in a factual matrix quite similar to that obtaining here. There we noticed a number of characteristics possessed by the union involved, and we held them sufficient to confer standing upon it although we expressed no opinion as to whether they would always be prerequisites to standing.[78] On close examination, I find that our union appellant has the self-same characteristics. It is recognized by NASA, the governmental employer, as the exclusive bargaining agent for all civil service employees at Marshall.[79]

See also National Motor Freight Traffic Ass'n v. United States, 372 U.S. 246, 247, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963).

72. E. g., NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Alabama, 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1959). I do not reach the issue whether the First Amendment right of government employees to join unions, McLaughlin v. Tilendis, 398 F.2d 287, 288–289 (7th Cir. 1968); Atkins v. City of Charlotte, 296 F.Supp. 1068, 1075–1077 (W.D.N.C. 1969), embraces the right to bring suit as an association. Cf. Brotherhood of R. R. Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 5–8, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964).

73. See note 62, supra.

74. United Fed'n of Postal Clerks, AFL-CIO v. Watson, supra note 37, 133 U.S. App.D.C. at 183–184, 409 F.2d at 469–470, quoting Flast v. Cohen, supra note 62, 392 U.S. at 106, 88 S.Ct. 1942 (footnote omitted).

75. Citizens Ass'n of Georgetown v. Simonson, supra note 71, 131 U.S.App.D.C. at 153, 403 F.2d at 176. See also United Fed'n of Postal Clerks, AFL-CIO v. Watson, supra note 37, 133 U.S.App.D.C. at 183–184, 409 F.2d at 469–470; Office of Communication of the United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 336, 359 F.2d 994, 1002 (1966); MacArthur Liquors, Inc. v. Palisades Citizens Ass'n, supra note 71; Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 615 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

76. United Fed'n of Postal Clerks, AFL-CIO v. Watson, supra note 37, 133 U.S. App.D.C. at 184, 409 F.2d at 470 (footnote omitted). Organizational standing has frequently been accorded where the organization has acted in behalf of its membership before administrative agencies. Toilet Goods Ass'n v. Celebrezze, 235 F.Supp. 648 (S.D.N.Y.1964), aff'd in part and rev'd in part on other grounds, 360 F.2d 677 (2d Cir. 1966), aff'd on other grounds, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Abbott Laboratories v. Celebrezze, 228 F.Supp. 855, 860–861 (D.Del.1964), vacated on other grounds, 352 F.2d 286 (2d Cir. 1965), rev'd, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). See also National Motor Freight Traffic Ass'n v. United States, supra note 71, 372 U.S. at 247, 83 S.Ct. 688; United Fed'n of Postal Clerks, AFL-CIO v. Watson, supra note 37, 133 U.S.App.D.C. at 184, 409 F.2d at 470.

77. Supra note 37.

78. 133 U.S.App.D.C. at 184, 409 F.2d at 470.

79. See note 2, supra.

By the presidential order underpinning that status, it is charged with representing the interests of those employees without discrimination.[80] It bears the responsibility for consulting with NASA on the issues at the core of the controversy at bar.[81] Already in administrative contexts it has represented its constituency in regard to those issues.[82]

On this showing, I have no reason to doubt that the Union will represent its membership effectively in this litigation. As we felt in *Watson*, "it [is] artificial and pointless to cut off its representative functions at the courthouse door." [83] In my view, the Union [84] has standing to assert the interests of its employee members.[85]

## IV

I come now to the District Court's holding that appellants' action therein was premature because instituted prior to exhaustion of individual efforts to obtain relief from the Civil Service Commission against the demotions and discharges threatened by the reduction in force at Marshall. Appellants sought the Commission's aid before coming into court, and during the pendency of the suit numerous employees at Marshall filed individual appeals with the Commission. Those appeals were still under consideration when the District Court entered its order of dismissal, and were pursued by the employees long thereafter. It was only after the appeal to this court

---

80. Exec.Order No. 10988 § 6(b), 3 C.F.R. 521 (1964).

81. Article VI of the collective bargaining agreement, see note 2, *supra*, gives the Union the authority, unless the employee wishes to proceed on his own, to process all complaints and grievances through a panoply of administrative procedures at Marshall. Articles IV and XVI provide specifically for consultations in regard to reductions in force. And, of course, the Union's "standing does not depend on any unanimity of interest in the matter at bar on the part of all its members." United Fed'n of Postal Clerks, AFL–CIO v. Watson, *supra* note 37, 133 U.S.App.D.C. at 184 n. 30, 409 F.2d at 470 n. 30.

82. The collective bargaining agreement, see note 2, *supra*, itself contains the fruits of previous negotiations in regard to reductions in force, art. XVI, and service contracts, art. XXVII. The Union acted for the employees in contacting NASA's administrator and the Civil Service Commission following announcement of the reduction in force, and various decisions during the course of Commission appeals indicate that the Union has managed the employees' cases.

83. United Fed'n of Postal Clerks, AFL–CIO v. Watson, *supra* note 37, 133 U.S.App.D.C. at 184, 409 F.2d at 470 (footnote omitted).

84. For similar reasons, the District Court's allowance of NCTSI's intervention as a party to the litigation must be upheld. Within NCTSI's membership, see text

*supra* at note 5, are private concerns that are parties to the service support contracts specifically under attack by appellants. These concerns would themselves have unimpeachable standing to defend the interests their contracts purport to confer, and NCTSI is charged with the responsibility for representing the interests of its members on questions of legality of such contracts. No more than in the case of the Union does the standing of NCTSI hinge upon a subject matter interest common to its entire membership, see note 81, *supra*; no less than in the Union's case is a vigorous, effective representation of membership rights portended.

As I read the transcript of the hearing on NCTSI's motion to intervene, the District Court viewed the motion as one essentially invoking its discretion. Over the opposition of both NASA and the Union, the court, at a comparatively early stage of the proceeding, granted leave to intervene, finding expressly that existing parties would not be prejudiced thereby. The court's action is sustainable as a discretionary exercise finding sanctuary in Fed.R.Civ.P. 24(b).

85. The ruling that the Union has standing to sue disposes of NASA's objections that the Union is not a "real party in interest" within the meaning of Fed. R.Civ.P. 17(a), see United Fed'n of Postal Clerks, AFL–CIO v. Watson, *supra* note 37, 133 U.S.App.D.C. at 184–185, 409 F.2d at 470–471, and that it is not a member of the class it seeks to represent within the meaning of Fed.R.Civ.P. 23.

had been perfected, and a week before oral argument therein, that the Commission's Board of Appeals and Review rendered the final administrative decision. Appellees now press the argument that in these circumstances the District Court's dismissal should be upheld.

 Resort to the courts must ordinarily be postponed until administrative remedies available for rectification of the errors complained of have been exhausted.[86] And the court, as a general rule, must stay its hand in reduction in force controversies until administrative resolution of the matters in issue in a proceeding efficacious to that end.[87] The exhaustion doctrine "does not require merely the initiation of prescribed administrative procedures. It is one of exhausting them, that is, of pursuing them to their appropriate conclusion and, correlatively, of awaiting their final outcome before seeking judicial intervention."[88] And, "[t]hat fact that administrative action is probably erroneous does not create an exception to the rule that administrative processes must be exhausted before judicial relief is sought."[89]

Congress has imposed upon the Civil Service Commission the duty of administering and enforcing the civil service laws,[90] including the prescription of "regulations for the release of competing employees in a reduction in force."[91] Compliably, the Commission has promulgated regulations specifying standards for determining whether particular employees are to be subjected to reductions in force,[92] and providing for corrective steps in instances of deviation.[93] The Commission's regulations also afford procedures whereby civil service employees affected by reductions in force may challenge personnel actions adverse to them. An employee aggrieved by a reduction in force is afforded an initial appeal to the Commission [94] and, if dissatisfied with the initial decision, a further appeal to the Commission's Board of Appeals and Review.[95] Vindication of the employee's position entitles him to reinstatement with "all or any part of the pay, allowances, or differentials" that would have been forthcoming had the action complained of not occurred.[96]

 On the other hand, the exhaustion requirement contemplates an efficacious administrative remedy, and does not obtain when it is plain that any effort to meet it would come to no more than an exercise in futility.[97] Appel-

86. FCC v. Schreiber, 381 U.S. 279, 296–297, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938); Spanish International Broadcasting Co. v. FCC, 128 U.S.App.D.C. 93, 102, 385 F.2d 615, 624 (1967).

87. Young v. Higley, 95 U.S.App.D.C. 122, 220 F.2d 487 (1955); Fitzpatrick v. Snyder, 220 F.2d 522, 524 (1st Cir.), cert. denied, 349 U.S. 946, 75 S.Ct. 875, 99 L.Ed. 1272 (1955); Burns v. McCrary, 229 F.2d 286, 287 (2d Cir. 1956); Hills v. Eisenhart, 256 F.2d 609, 610–611 (9th Cir.), cert. denied, 358 U.S. 832, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958).

88. Aircraft & Diesel Equip. Corp. v. Hirsch, 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796 (1947).

89. Young v. Higley, *supra* note 87, 95 U.S.App.D.C. at 122, 220 F.2d at 487, quoting Johnson v. Nelson, 86 U.S.App. D.C. 98, 180 F.2d 386, cert. denied, 339 U.S. 957, 70 S.Ct. 980, 94 L.Ed. 1368 (1950).

90. 5 U.S.C. § 1104(a) (5) (A) (Supp. IV 1969).

91. 5 U.S.C. § 3502 (Supp. IV 1969).

92. 5 C.F.R. pt. 351 (1969).

93. 5 C.F.R. §§ 351.902(b), 772.307(c) (1969).

94. 5 C.F.R. § 351.901 (1969).

95. 5 C.F.R. §§ 772.301, 772.306, 772.307 (1969).

96. 5 U.S.C. § 5596(b) (Supp. IV 1969).

97. City Bank Farmers Trust Co. v. Schnader, 291 U.S. 24, 34, 54 S.Ct. 259, 78 L.Ed. 628 (1934); Montana Nat'l Bank of Billings v. Yellowstone County, 276 U.S. 499, 505, 48 S.Ct. 331, 72 L. Ed. 673 (1928); Waite v. Macy, 246 U.S. 606, 609, 38 S.Ct. 395, 62 L.Ed. 892 (1918).

lants have directed attention to circumstances that raise combinationally a serious question as to whether the Civil Service Commission possessed the necessary authority to determine the central legal issue—legality of Marshall's service support contracts—posed in the District Court litigation. By way of recapitulation, after the court's preliminary injunction was entered, NASA and the Commission agreed that 598 of the 764 reductions in force then scheduled would be canceled because of "improper service contract operations." When, promptly thereafter, intercession by the Commission was sought as to the remaining 166 civil service employees, its then Chairman professed a lack of power to deal with the situation unilaterally, stating that "NASA is solely responsible" for the action complained of. After the District Court had passed its order of dismissal, the Commission's Atlanta Region, on initial appeal by the individual appellants, subscribed to the view that the legality of the service support contracts was an issue beyond the scope of reduction in force appeals,[98] as did the Commission's Board of Appeals and Review upon the final administrative appeal that followed.[99]

So, throughout the administrative process, the Commission has disclaimed jurisdiction to correct, on the employees' appeals, the alleged improprieties in NASA's contract employment policies or to alter NASA's employment decision effectuating those policies. Appellants argue with considerable force that in actuality they never had a meaningful or effective administrative remedy before the Commission, and so were entitled to immediate recourse to the District Court.

■ I find it unnecessary, however, to address this question since, however the District Court should properly have ruled upon it, the administrative remedy has now been fully exhausted. One week before oral argument here, the Board of Appeals and Review handed down the decision that signals the end of the administrative route for at least some of the appealing employees.[100] Any resolution now made of the exhaustion issue would entail the rendition of an essentially advisory opinion and, even if adverse to appellants, would not now warrant affirmance of the District Court's dismissal.

■ The duty of an appellate tribunal is to fashion dispositions "as may be just under the circumstances," [101] and that mission has frequently been ac-

98. The Regional Director stated that "[t]he issue of whether or not any contract between NASA and a private firm is improper or has resulted in the procurement of personal services in violation of the Federal Personnel Laws is a matter that is irrelevant to, and not for decision in, a reduction-in-force appeal."

99. As put by the Board, "[a] decision to carry out some of its functions by using other than Federal civilian employees is a matter solely within the administrative discretion of the agency and the propriety of such a decision is not subject to review or modification by the Civil Service Commission in the adjudication of the reduction-in-force appeal of any federal civilian employee affected thereby."

100. The decision of the Board of Appeals and Review is the terminal step in the administrative process. Section 10(c) of the Administrative Procedure Act provides that "[a]gency action made review-able by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704 (1964). That section further provides that "[e]xcept as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for * * * any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority." Id. I am aware of no statute requiring Commission consideration beyond the Board of Appeals and Review, and the Commission's regulations themselves provide that "[t]he decision of the Board is final and there is no further right of appeal." 5 C.F.R. § 772.307(c) (1969).

101. 28 U.S.C. § 2106 (1964).

complished by a remand even to afford a litigant a second opportunity to do something he should have done in the first place.[102] That course becomes all the more appropriate where, as here, appellants' obligation to first seek relief from the Civil Service Commission remains enshrouded in uncertainty. Under present circumstances, and particularly with the Civil Service Commissioners as well as NASA's Administrator parties before the District Court, the ends of justice would be best served by a remand to enable appellants to pave the way to full litigation of their claims. Nonexhaustion as a problem can easily be accommodated by granting appellants leave to file a supplemental pleading alleging exhaustion of administrative remedies,[103] and the District Court can then proceed to solve all aspects of the case on the merits.[104] The process of resolution will involve, to the extent that the Commission had administrative jurisdiction of the controversy, review of the proceedings before the Commission on the administrative record made,[105] and to any further extent in an orthodox hearing or trial.[106]

## V

In concluding that the doctrines of standing and exhaustion erect no barrier to prosecution of this suit on the merits. I have delved neither into the sufficiency of the allegations of the complaint to state a cause of action nor the ramifications of statutory interpretation that underlie such an inquiry. That is initially the function of the District Court, whose earlier disposition foreclosed consideration of those matters,[107] and this court could not in any event now do more than enable that function to go forward.[108] Ostensibly in recognition of this need, appellants' prayer in this court is for an annulment of the judgment of dismissal and a remand for proceedings on the merits; and it is perhaps in consequence of this that only NCTSI has presented a brief addressed squarely to the ultimate question of statutory construction. I wish to make it clear that in discharging my responsibilities on the present appeal, I intimate no view on the merits of the controversy.

TAMM, Circuit Judge (concurring):

I concur in the result reached by Judge Robinson in his opinion in this case. I do not question that the authorities quoted in that opinion stand for exactly the principle for which they have been enumerated, but I do not believe that these lengthy data are necessary to support

102. See Alabama Polytechnic Institute v. District of Columbia, 102 U.S.App.D.C. 83, 85–86, 250 F.2d 408, 410–411 (1957) ; Kittrell v. Blackwell, 326 F.2d 752 (3d Cir. 1964) ; M. M. Landy, Inc. v. Nicholas, 221 F.2d 923, 924–926, 53 A.L.R.2d 1385 (5th Cir. 1955).

103. Fed.R.Civ.P. 15(d) authorizes the court to permit a party "to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." The Rule expressly provides that "[p]ermission may be granted even though the original pleading is defective in its statement of a claim for relief or defense" and, as judicially interpreted, even though the curative circumstances were not in existence when the original pleading was filed. United States for Use of Atkins v. Reiten, 313 F.2d 673, 675 (9th Cir. 1963) ; Lynam v. Livingston, 257 F.Supp. 520, 525 (D. Del.1966).

104. It is clear that some, though unclear as to whether all, of the individual appellants ran the administrative gamut. Any problem in this regard is left for resolution by the District Court.

105. See Eberlein v. United States, 257 U.S. 82, 84, 42 S.Ct. 12, 66 L.Ed. 140 (1921) ; Eustace v. Day, 114 U.S.App. D.C. 242, 314 F.2d 247 (1962) ; Powell v. Brannan, 91 U.S.App.D.C. 16, 18, 196 F.2d 871, 873 (1952).

106. This would, of course, permit a disposition on motion for summary judgment if the conditions specified in Fed.R.Civ.P. 56 are met.

107. The District Judge, in announcing from the bench his decision to dismiss, stated that "I intimate no views, because in fact I have none, as to the legality of the arrangement" at Marshall.

108. Compare Flast v. Cohen, supra note 62, 392 U.S. at 106 n. 26, 88 S.Ct. 1942, 20 L.Ed.2d 947.

the court's action in this case. The teachings of Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970), Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) are that the only conditions necessary to establish standing are a showing of aggrievement in fact, a prima facie showing of some administrative illegality, a case or controversy under Article III of the Constitution, and sufficient review of the relevant statutes to establish that there is no manifestation of a congressional intent that judicial review should be withheld. These criteria being met in the present case, I feel that the appellants have the necessary standing to maintain this action and that the case consequently must be remanded.