LODGE 1858, AMERICAN FEDERA-
TION OF GOVERNMENT EM-
PLOYEES, et al., Plaintiffs,

v.

ADMINISTRATOR, NATIONAL AERO-
NAUTICS AND SPACE ADMINIS-
TRATION, et al., Defendants,

and

National Council of Technical Service
Industries, Intervenor-Defendant.

Civ. A. No. 3261–67.

United States District Court,
District of Columbia.

Aug. 12, 1976.

Edward L. Merrigan, Washington, D.C., for plaintiffs.

Earl J. Silbert, U.S. Atty., Ellen Lee Park, Asst. U.S. Atty., Washington, D.C., for defendants; Sidney G. Masri, Chief, Trial Counsel, National Aeronautics and Space Administration, Washington, D.C., of counsel.

James F. Fitzpatrick, and Stephen M. Sacks, Arnold & Porter, Washington, D.C., for National Council of Technical Services Industries, intervenor-defendant.

## MEMORANDUM OPINION

WADDY, District Judge.

This is a suit for declaratory judgment and injunctive relief arising out of a reduction-in-force (RIF) action, resulting from budget cuts, among civil service personnel at the George C. Marshall Space Flight Center, Huntsville, Alabama (the Marshall Center).

Plaintiffs are: (1) Lodge 1858, American Federation of Government Employees, a labor organization recognized by the National Aeronautics and Space Administration (NASA) as the exclusive bargaining agent under Executive Order 10988 for all civil service employees at the Marshall Center; and (2) six named individual civil service employees. Pursuant to the RIF action, the individual plaintiffs and about 760 other civil servants received notices on December 6, 1967, informing them that they would either be reduced-in-grade or separated from government service effective January 13, 1968.

Defendants are the Administrator of NASA and the Chairman and Members of the Civil Service Commission. Defendant-intervenor is the National Counsel of Technical Service Industries (NCTSI), a non-profit corporation comprised of companies which contract with various Federal agencies, including NASA, to supply support services.

Plaintiffs contend that NASA violated the personnel procurement restrictions of its enabling Act, The National Aeronautics and Space Act of 1958, as amended, as such are delineated in 42 U.S.C. § 2473(b)(2), as well as other federal statutes relating to the hiring, retention and employment of civil service employees by instituting a RIF among civil service employees when support service contractor and sub-contractor employees were allegedly performing work reserved to civil service personnel. Plaintiffs also contend the RIF violated the Union's collective bargaining contract with NASA.

Plaintiffs seek a declaration that the RIF action and various support service contracts are unlawful and an injunction restraining and enjoining NASA from continuing to enter into and perform such support service contracts. Plaintiffs also seek reinstatement of the affected civil service employees to the positions, grades and classifications from which they were separated by reason of the RIF and NASA's contracting practices, and an award of back pay and employee benefits.[1]

The case is before the Court on the motion of plaintiffs for final summary judgment and the cross-motions of defendants and NCTSI for summary judgment. Also

---

1. Plaintiffs' Supplemental and Amended Complaint for Declaratory Judgment and Injunction filed October 7, 1970.

pending is a ruling on an Order to Show Cause why defendants should not be held in contempt for failing to comply with the Court's Orders of November 30, and December 21, 1973.[2]

## I. HISTORY OF THE CASE

Shortly after the case was filed in 1967, the late Judge Alexander Holtzoff granted plaintiffs' motion for preliminary injunction and enjoined the RIF action at the Marshall Center. Defendants thereafter advised the Court by means of a memorandum denominated *"NASA–CSC Agreement on the MSFC Reduction-in-Force"* that all but approximately 166 separation and reduction-in-grade notices[3] to civil service employees at the Marshall Center were being cancelled due to the existence of improper support service contract operations. On defendants' motions, the Court, by Order dated March 12, 1968, vacated the injunction "without prejudice to any administrative remedies that may be possessed by such individual employees in whose cases NASA now effectuates its RIF actions under the Agreement reached between the Civil Service Commission and NASA." The complaint was dismissed April 18, 1968, and plaintiffs appealed.

On April 21, 1970, the United States Court of Appeals for this Circuit reversed and remanded the case for further proceedings on the merits. *Lodge 1858, American Federation of Government Employees v. Paine,* 141 U.S.App.D.C. 152, 436 F.2d 882 (1970).[4] Upon the completion of lengthy discovery proceedings, plaintiffs moved for summary judgment, defendants cross-moved for summary judgment, and NCTSI moved to dismiss the complaint.

On November 30, 1973, partial summary judgment was granted to plaintiffs. This Court ruled that the six elements or standards[5] set forth in an opinion written in October 1967 by Leo Pellerzi, then General Counsel of the Civil Service Commission, as to the legality of two representative NASA support service contracts at the Goddard Space Center, represented the appropriate "standards of review to be applied in determining whether or not an employer-employee relationship has been established between NASA and private contractor employees by the terms and performance of each of the support service contracts."

Quoting from General Counsel Pellerzi's Opinion, the Pellerzi Standards are set forth in the Court's Memorandum Opinion at pages 20–21 as follows:

"In the absence of clear legislation expressly authorizing the procurement of personnel to perform the regular functions of agencies without regard to the personnel laws, we must insist on scrupulous adherence to those laws and the policies they embody. Accordingly, contracts which, when realistically viewed, contain all the following elements, each to any substantial degree either in the terms of the contract, or in its performance, constitute the procurement of personal services proscribed by the personnel laws.

—Performance on-site

—Principal tools and equipment furnished by the Government

—Services are applied directly to integral effort of agencies or an organiza-

---

**2.** The Order to Show Cause was taken under advisement after a hearing on April 22, 1974.

**3.** Of the 166 notices which were not cancelled, approximately 56 involved employee separations and approximately 110 involved reductions-in-grade.

**4.** The Court of Appeals recognized, *inter alia,* that plaintiff Lodge 1858, American Federation of Government Employees, had standing to sue on behalf of its members, and that NCTSI had standing to intervene as a defendant on behalf of its members. Furthermore, since during the time which elapsed between entry of the Dis-

trict Court's order of dismissal and the Court of Appeals decision, the administrative remedy had been exhausted, the Court held that the doctrine of exhaustion of administrative remedies " * * * erect[ed] no barrier to prosecution of this suit on the merits" and suggested a supplemental pleading alleging exhaustion be filed. 436 F.2d at 898.

**5.** Hereinafter the "Pellerzi Standards" or "Pellerzi Elements".

tional subpart in furtherance of assigned function or mission

—Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel

—The need for the type of service provided can reasonably be expected to last beyond one year

—The inherent nature of the service, or the manner in which it is provided reasonably requires directly or indirectly, Government direction or supervision of contractor employees in order:

—To adequately protect the Government's interest or

—To retain control of the function involved, or

—To retain full personal responsibility for the function supported in a duly authorized Federal officer of employee.

"Applying these standards, the contracts under review and all like them are proscribed unless an agency possesses a specific exception from the personnel laws to procure personal services by contract."

The Court concluded at page 22 of the Opinion that

". . . 42 U.S.C. Section 2473(b)(2) requires NASA to appoint all of its officers and employees in excess of 425 of the scientific, engineering and administrative personnel in accordance with the Civil Service laws and prohibits the Administrator of. NASA from entering into contracts and enforcing contracts with Intervenors or others that make non-civil service employees NASA employees as defined in the Pellerzi Opinion, and that all such contracts in existence on December 6, 1967, and at present, were and are null and void."

The Court ordered further proceedings held in abeyance and referred the case to the Civil Service Commission (Commission) with instructions to investigate the involved support service contracts and to apply the Pellerzi Standards to

"determine whether the relationship of employer-employee existed on December 6, 1967, and exists at the present time between National Aeronautics and Space Administration and the contractor non-civil service employees involved in this case, and report its finding to this Court within 60 days from the date hereof."

Defendants then moved for clarification of the November 30, 1973 Order, requesting that the Court's references to the Pellerzi Standards include the interpretation rendered in a supplemental opinion by the subsequent General Counsel of the Civil Service Commission, Anthony L. Mondello, on July 5, 1968.[6] On December 21, 1973, the Court ruled that

". . . the Mondello Supplement did not modify or change the 'Pellerzi Standards' but, as stated in the Supplement, its purpose was '. . . to *clarify* the meaning of these (Pellerzi) elements and the scope of the opinion in order to ensure that support service contracts are not drafted or performed in a manner which will evade the requirements of the personnel laws'; and * * * [the] supplement did not add any new or different standards or cancel or delete any of the 'Pellerzi Standards' but reaffirmed them and supplied the clarification thereof." (Emphasis in Original)

On February 19, 1974, defendants submitted proposed Commission steps to implement the Court's mandate and moved for an extension of time for the Commission to complete its investigation and report its findings back to the Court. Included therein was a letter dated February 1, 1974, from the office of the United States Attorney as defense counsel to the Commission's General Counsel Anthony Mondello. In pertinent part, that letter reads:

". . . We advise that the Commission must apply the 'six elements' enumerated in the 'Pellerzi Opinion', subject to the emphasis or clarification supplied in the * * * 'Mondello Opinion'.

"This means that, with particular reference to the 'sixth element' in the 'Pellerzi

---

**6.** Hereinafter the "Mondello Supplement".

Opinion', that of proscribed supervision: Under the terms of Judge Waddy's mandate, the investigation must determine whether the terms of the contract, or the actual operations thereunder, disclose the indicated substantial degree of supervision creating a relationship tantamount to that of employer-employee. In this regard, sporadic supervision of an individual (one of numerous contractor employees) may be ignored, but relatively continuous, close supervision of the private contractor employees by NASA supervisors must be taken into account. Under the reasonable approach which must be taken for each and every one of the six elements listed in the 'Pellerzi Opinion', to be in violation of the 'sixth element', the NASA supervision must be of a substantial number of contractor employees."

On April 2, 1974, the Court entered an order denying defendants' motion for an extension of time and "for Court approval of the proposed Civil Service Commission steps, which differ from the Court's Order of November 30, 1973 and which further delay implementation of said Order". On April 22, 1974, the Court took under advisement plaintiffs' motion to hold defendants in contempt for failure to comply with this Court's Orders dated November 30, and December 21, 1973.

From March 11, 1974 through April 5, 1974, the Commission examined thirty-two (32) support service contracts in force at the Marshall Center, including the satellite operations known as Mississippi Test Facility (MTF), located at Bay St. Louis, Mississippi, and the Michoud Assembly Facility (Michoud), located at New Orleans, Louisiana. Five of these contracts were viewed by the Commission as within the purview of this Court's Order although they had not originally been identified as within the litigation.

The Commission submitted its Report on May 30, 1974, concluding that none of the 32 NASA support contracts investigated created a relationship tantamount to that of employer-employee. The Commission's filing consisted of a *"Summary Report"* and 32 individual reports covering each of the NASA support service contracts. Some of these contracts had been in effect in 1967 when the RIF challenged herein occurred; the others were either follow-on or replacement contracts in effect when the Commission investigation was undertaken. The individual reports contain copies of the contracts and modifications thereto, affidavits of involved personnel, and other evidentiary material accumulated in connection with the investigation and report preparation. A summary of the Commission's conclusions is as follows:

(1) Of the 12 contracts in effect at the Marshall Center in 1967

___ None were found to involve Government Supervision (Pellerzi Element 6)

___ Additionally, three were found to have been performed off-site (Pellerzi Element 1); and two of these three were also found not to involve the use of Government Equipment (Pellerzi Element 2);

(2) Of the 12 contracts in effect at the Marshall Center at the time of the investigation

___ None were found to involve Government Supervision (Pellerzi Element 6)

___ Additionally, two were found to have been performed off-site (Element 1);

(3) Of the eight Government-owned, Contractor-operated (GOCO) type contracts at the Mississippi Test Facility and the Michoud Assembly

___ None were found to involve Government Supervision (Element 6)

___ Additionally, five did not meet the integral effort standard (Element 3).

Thus, 22 of the 32 contracts investigated were found to contain all of the Pellerzi Elements except Element 6, Government Supervision; eight of the contracts involved all but two of the Pellerzi Elements; and two of the contracts involved only three of the Pellerzi Elements.

The Commission's *Summary Report,* at *Section VI. Results of Application of the "Pellerzi Standards",* states in relevant part:

"A critical issue discussed in [the letter from the Office of the U.S. Attorney dated February 1, 1974 to General Counsel Mondello] had to do with the application of the 'Pellerzi Standards' and the effect, if any, of the 'Mondello Opinion'. The crux of this discussion was that in order for a determination to be made that a relationship is tantamount to employer-employee existed: (1) all six of the 'Pellerzi Standards' elements had to be present, each to a substantial degree, and (2) *with regard to the sixth element, relatively continuous, close supervision of a substantial number of contractor employees must be present* and must be shown to be related to one of the following requirements, '(a) to adequately protect the Government's interest, or (b) to retain control of the function involved, or (c) to retain full personal responsibility for the function supported in a duly authorized Federal officer or employee.'

"Therefore, the determinations presented in the individual reports, * * * were made in accordance with the instructions given by the Office of the U.S. Attorney." (Emphasis supplied) [7]

## II. THE PRESENT CONTROVERSY

In their motion for final summary judgment, plaintiffs have made various challenges to the manner in which the Commission applied the Pellerzi Standards and the conclusions reached. In plaintiffs' view, the Commission was misdirected and misled by government counsel as to the correct application of the Pellerzi Elements, particularly with respect to the sixth element, and that the Commission's conclusions are therefore arbitrary and capricious. They urge this Court to consider all of the evidence and find that the preponderance of the evidence supports the conclusion that an unlawful employer-employee relationship existed, and continues to exist under the support service contracts reviewed.

Defendants and defendant-intervenor NCTSI take the position that the Commission properly applied the Pellerzi Standards, as clarified by the Mondello Supplement. They contend there has been a fair and bona fide investigation which produced evidence supporting the Commission's findings and that the conclusions are not arbitrary and capricious. Defendants maintain that since the Commission was given the investigatory task because of its "special competence in the field", its reports should be given great weight by the Court under the rationale of *Wheelabrator Corporation v. Chaffe,* 147 U.S.App.D.C. 238, 455 F.2d 1306 (1972). Defendant-intervenor NCTSI also places reliance on the *Wheelabrator* case, contending that although the Court is not bound by the Commission's findings and conclusions, they should be given very substantial consideration and weight. Each urges that their respective motions for summary judgment be granted.

■ Turning first to the threshold question of how much weight is to be accorded to the Commission's investigation and reports, the Court notes that our Court of Appeals held in *Wheelabrator Corporation v. Chaffe, supra* at 1316, that:

"Under the doctrine of primary jurisdiction, a court may entertain an action for permanent relief and defer its consideration of the merits until an agency 'with a special competence' in the field has ruled on the issues, * * * The court has the last word, but it can properly seek the benefit of whatever contributions can be made by an agency whose 'area of specialization' embraces problems similar to or intermeshed with those presented to the court."

The Court finds guidance in the *Wheelabrator* approach, and agrees with defendants and defendant-intervenor NCTSI that sub-

---

7. "Review of Support-Service Contracting—NASA", Summary Report, by the U.S. Civil Service Commission, May 1974, at 11.

stantial consideration and great weight should be given to the Commission's findings and conclusions because it is an agency "with special competence in the field". The final determination of whether these contracts constitute the procurement of personal services proscribed by the personnel laws, however, rests with the Court.

## A. APPLICATION OF THE PELLERZI STANDARDS

The basic criteria for determination of whether an employer-employee relationship exists between an individual and the Federal government are set forth in 5 U.S.C. § 2105(a).[8] The six Pellerzi Elements, in turn, relate primarily to the third of these statutory criteria. In this regard, the Pellerzi analysis of the two representative NASA support service contracts begins by stating at page 22:

> "[T]his criterion embodies the same considerations as the common law test of control of a servant. * * * It is the right or power to control the individual in the performance of his work and the manner in which the work is done that is usually decisive."

■ Following a discussion of various provisions of the representative contracts and a brief review of the operations thereunder, General Counsel Pellerzi concluded that the contractor supervisors were merely *pro forma* supervisors. The inquiry, however, went further, there being "other factors relevant to whether the power of direction and control exists and is exercised by Federal officials over the contractor's personnel."[9] Those factors are embodied in the Pellerzi Elements, which are not to be mechanically applied. Contracts under review are to be realistically viewed, both by their terms and operation.

## B. THE REQUIREMENT THAT ALL SIX PELLERZI ELEMENTS BE PRESENT

When reviewing the contracts at issue herein, the Commission applied a test requiring that all six elements be present, each to a substantial degree. There is apparently no disagreement among the parties as to the "substantial degree" requirement. Controversy has arisen, however, over whether all six elements *must* be present. The Pellerzi Opinion, in setting forth the elements, states at page 40:

> "[C]ontracts which, when realistically viewed contain all the following elements, each to any substantial degree, either in the terms of the contract, or in its performance, constitute the procurement of personal services proscribed by the personnel laws."

■ It is clear that contracts containing all six elements will bring about the proscribed employer-employee relationship. However, the Pellerzi Opinion, at page 21, also addresses the question of whether all six elements must be present.

> "The criteria must be realistically applied and the end-point determination reached on the basis of the overall substance of the contract operations. For the purpose of insuring compliance with the personnel laws we do not believe it possible to refine the criteria or weigh their elements

---

8. 5 U.S.C. § 2105(a) provides:

"(a) For the purpose of this title, 'employee', except as otherwise provided by this section or when specifically modified, means an officer and an individual who is—

(1) appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a Member or Members of Congress, or the Congress;

(C) a member of a uniformed service;

(D) an individual who is an employee under this section;

(E) the head of a Government controlled corporation; or

(F) the adjutant general designated by the Secretary concerned under section 709(c) of title 32, United States Code;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; and

(3) subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position."

9. Pellerzi Opinion at 25.

in application so as to indicate that mere changes in form or terminology will meet the substance of the Commission's objections. If, in substantial effect, the contract results in a form of personnel procurement not expressly authorized by law, it is proscribed by the personnel laws."

The Mondello Supplement further clarifies the correct approach by first recalling the relationship between the Pellerzi Standards and 5 U.S.C. § 2105(a), and then correctly stating:

"The absence of any one or a number of [the six Pellerzi Elements] would not mean that supervision does not exist but only that there is less likelihood of its existence. Moreover, any single element may not be significant unless its presence is felt to a substantial degree."

The Court concludes that when read in context, and with the aid of the Mondello Supplement, all six elements need not be present for a finding that the proscribed relationship exists.

## C. THE PARTICULAR ELEMENTS CHALLENGED

With respect to the sixth (and for purposes of this case, the most critical) Pellerzi Element, the Commission applied a test requiring "relatively continuous, close supervision [by Federal officials] of a substantial number of contractor employees." Plaintiffs contend that the correct test requires only a showing that "the inherent nature of the service, or the manner in which it is provided, reasonably requires, directly or indirectly, federal direction or supervision of contractor employees."

The sixth Pellerzi Element is as follows:

"The inherent nature of the service, or the manner in which it is provided reasonably requires directly or indirectly, Government direction or supervision of contractor employees in order:

—To adequately protect the Government's interest, or

—To retain control of the function involved, or

—To retain full personal responsibility for the function supported in a duly authorized Federal officer or employee."

The Mondello Supplement provides the following clarification:

"[The sixth element] which involves a requirement for close supervision of contractor employees by Government employees for the protection of Government interest and functions is a companion piece to Bureau of the Budget Circular A–76 which requires agencies to perform for themselves those basic functions of management which they must perform in order to retain essential control over the direction of their programs."

"Close supervision", as it relates to the sixth element, is a test to be applied in the context of the Government's interest in maintaining necessary control over the direction of its programs. Moreover, it is clear that "close supervision" can be either "direct or indirect". However, the inclusion of the word "continuous" in the test actually applied by the Commission is troublesome. The Court can find no support in the Pellerzi Opinion for such a requirement. The Mondello Supplement, in referring to the *fifth* [10] element, does state:

"The criterion stated in the fifth element is the continuing character of the Government need being met by the contract service. The suggestion that a need for service which lasts beyond a year must be filled by use of civil service personnel does not mean that contracts for briefer periods are invariably permissible. A contract for services to fill a temporary need of 30–60 days duration, but which involves continuous supervision of contractor employees by Government employees would be proscribed."

"Continuous supervision", in context, relates to those short-term or temporary contracts which are not to be disregarded.

10. Emphasis added.

■ To support the inclusion of "continuous supervision" in the Commission's application of the sixth element, defendants assert that the sixth element is an integral part of the fifth. Defendant-intervenor NCTSI refers the Court to the following passage at page 2 in the Mondello Supplement:

"For example, sporadic, unauthorized supervision over an occasional one of a much greater number of contractor employees might reasonably be ignored; whereas, relatively continuous supervision of a substantial number of contractor employees by Government employees would have to be taken into account."

That passage, however, was included to explain the meaning of "presence felt to a substantial degree", and not for the purpose of formulating the restrictive test applied by the Commission upon the recommendations and interpretations of counsel. The Court is therefore of the opinion that the Commission incorrectly applied the sixth element of the Pellerzi Standards, and that the test urged by plaintiffs would result in the correct application of that element.

The Commission's application of the first element, Performance On-Site, the second, Government Furnished Equipment, and the third, Services Applied Directly to the Integral Effort of the Mission, have also been attacked by plaintiffs, and justified by defendants and defendant-intervenor NCTSI. Those contentions, being more factually related, are considered in Parts III and IV of this Opinion.

Plaintiffs' challenges to the Commission's application of the Pellerzi Standards, and its conclusions as to the non-existence of the proscribed employer-employee relationship under each of the support service contracts reviewed, have persuaded the Court that further analysis must be undertaken. That analysis, however, will be limited to a review of the conclusions reached as to each contract.

## III. SUPPORT SERVICE CONTRACTS AT THE MARSHALL CENTER

The support service contracts at the Marshall Center are what are commonly referred to as "non-specific contracts", that is, cost-reimbursement, level-of-effort type contracts, expressed in manhours and activated by means of Schedule Orders [11] issued by an appointed Responsible Official, usually the Director of the Marshall Center function receiving the support services. The Responsible Official is charged with day-to-day administration and technical direction of the contract. The Schedule Order is implemented and coordinated by a government Technical Representative through specific Technical Directives. Often, Technical Monitors are designated to monitor and assist in evaluating specific Technical Directives. "Work Order Requests" directing work to be performed on a specific task as requested by the "user" or "customer" are subject to approval by the Technical Representative.

Generally, the early contracts, i. e., those prior to 1971, are strikingly similar to those found objectionable by the Pellerzi Opinion. In its Summary Report, the Commission observed that the early contracts consistently contained articles, clauses and language greatly restricting Contractor control. Examples of such restrictions include requiring detailed Contractor reporting; prior approval by the Contracting Officer of staffing plans, and of policies and procedures relating to such items as wages, benefits and personnel guidelines; and prior approval of diversion of key personnel.

The follow-on contracts provide substantially the same support services, performed by many of the same employees working under the same basic operations structure. Both the later replacement and follow-on contracts deleted many of the restrictions found objectionable by the Pellerzi Opinion, although in some instances the same objec-

11. A Schedule Order is a written authorization to the Contractor to perform certain work. It generally provides allotment for manhours and money, establishes deadlines for completion of work, material, overtime, and travel costs. The authorization may be changed from time to time by amendments to the Schedule Order and may also be supplemented by Technical Directives prepared by the Technical Representatives.

tives were achieved by incorporating the same language in the "Request for Proposal" (RFP). Additionally, the Marshall Center began to segregate work areas located on-site by constructing partitions, by moving certain contractors off-site, and by modifying contract language in an attempt to eliminate any connotation implying an employer-employee relationship.[12]

Plaintiffs contend that the contracts at issue herein are substantially identical in form, substance and operation to those ruled illegal in the Pellerzi Opinion, and that upon correct application of the Pellerzi Standards, this Court's conclusion must be the same. Defendants and defendant-intervenor NCTSI take the position that the contract restrictions are merely elements of contract administration necessary for control in cost reimbursement type contracts such as these; and, that, in any event, the corrective actions previously taken by the Marshall Center have cured any questionable features of the support service contracts.

### A. CONTRACTS IN WHICH ONLY PELLERZI ELEMENT 6 WAS FOUND NOT PRESENT

For purposes of contract-by-contract analysis, the Court turns first to those 17 contracts in which the Commission found all the Pellerzi Elements present except the sixth element, Government Supervision at the Marshall Center.

1. Contract No. NAS 8–20166 with the Brown Engineering Company was effective May 4, 1965 to May 2, 1970, under which Brown provided technical support services in engineering and operation of facilities to the Marshall Center's Research Projects Laboratory. The contract contained the typical administrative and control provisions outlined above, including the more restrictive provisions common to the early contracts. When the contract was phased-out in 1970, on-site work formerly done by Contractor employees was absorbed by Civil Service employees.

The Commission found that

"the contract language is carefully couched so as not to imply supervision over the work of contractor employees by Civil Service personnel, [but that] when one looks behind the words to how the contract actually seems to have been administered, the contractor was told what to do, when to do it, how it was to be done, the qualifications requirements for his key people, how and when to report on his activities, etc."[13]

It further noted authority for overall responsibility of the performance of the Research Projects Laboratory was vested in its Director, and that "to retain full personal responsibility for the functions of the Laboratory * * * assigned to him, some degree of direction or supervision of contractor employees (directly or indirectly) is reasonably required".[14] Such supervision was exercised through use of Contractor reports, control of where work could be performed and of workhours on-site, and the Article XIV in-depth requirements for Contracting Officer prior approval of numerous personnel activities.

2. Contract No. NAS 8–20070 was with Vitro Services Division of Vitro Corporation of America. It was effective from March 16, 1965 through July 31, 1971 and provided engineering, operation of facilities and fabrication support services to the Marshall Center Test Laboratory. Although similar support services continued to be supplied by other Contractors, much of the work performed under this particular contract was taken over by Civil Service employees. The typical administrative and control provisions found in the early contracts were included.

---

12. In the Summary Report, the Commission expressed the opinion that these actions were part of a campaign to "clean-up" support service contracts generated in part by the Pellerzi Opinion.

13. Report On: Brown Engineering Company, Inc. Contract No. NAS 8–20166, by the U. S. Civil Service Commission, May, 1974, at pages 21–22.

14. *Id.,* at 24–25.

In its report on NAS 8–20070, the Commission itemized numerous elements of control and direction taken from various sections of the contract and relating to: detailed reporting and record keeping, key personnel, over-time approval, transmission and execution of the Contracting Officer's directions and instructions, working hours, inspection procedures, work and workmanship levels of performance, prior approval of labor rates and salaries (for both direct and indirect labor), and prior approval of personnel policies and procedures. Additionally, the contract provided for (1) phase-in phase-out services, (2) Contracting Officer review of personnel resumes of all Contractor employees whose salaries were charged as direct labor, and (3) government or successor Contractor interviews with Vitro Services employees for future employment purposes.

The Commission noted that

"[n]o provision is made in the contract for redelegating the responsibility of the responsible official [and] [i]mplicit in the retention of full personal responsibility is the capacity to establish the standards of performance and to determine that satisfactory performance has been achieved." [15]

It further found that "according to the terms of the contract the government does establish standards of performance and the government ultimately decided whether or not work had been accomplished in a satisfactory manner." [16]

3. Technical support services were provided to the Quality and Reliability Assurance Laboratory at the Marshall Center by SPACO, Inc. under contract No. NAS 8–20081 from April 1, 1965 to August 20, 1971. The contract Appendices indicate the services included support to the NASA training school; maintenance and installation of electrical equipment; stage and ground

support equipment checkout station schematics; work order scheduling and fabrication coordination; engineering and design support; checkout data acquisition and instrumentation; quality engineering analysis, evaluation, calibration and environmental testing; engineering support for design, development, test, documentation preparation, reliability and related tasks; part program and engineering support; fabrication and related services; and parts reliability information center.

The SPACO contract contained both the basic and the more restrictive control provisions, with additional controls imposed depending upon the particular function being supported. The "Charter"—or functional statement—for the Quality and Reliability Assurance Laboratory states the Laboratory is "to establish, *supervise* and maintain a comprehensive quality and reliability assurance program", [17] the responsibility resting with the Director.

Since the support services corresponded to established Laboratory functions, the Commission's view was that there was a presumption "that these services were performed under guidance, supervision, and direction of the heads of [Laboratory] offices." [18] The report supports this presumption by citing examples of position descriptions charging civil service employees with responsibility for direction, control, coordination, integration, approval, *etc.* in support of the particular Laboratory function.

Civil Service employees, however, were prohibited from directly assigning work to contractor employees, as noted by the Commission

"[T]o avoid the appearance of employer-employee relationship between MSFC personnel and contractor personnel a paper system was established so that controls, such as, manhour and dollar limita-

15. Report on: *Vitro Services Disision [sic] of Vitro Corporation of America Contract No. NAS 8–20070*, by the U. S. Civil Service Commission, May, 1974, at pages 22–23.

16. *Id.*, at 23.

17. *Report on SPACO, Inc. Contract No. NAS 8–20081*, by the U. S. Civil Service Commission, May, 1974, at pages 12–13 (emphasis in original).

18. *Id.*, at 13.

tions, deadline dates, priorities, and work instructions (authorization to perform specific work) could be passed in writing from a civil service supervisor to a contractor supervisor. Moreover, in order to implement this paper process a network of civil service supervisors, called Appendix Monitors, Technical Representatives, Task Monitors, etc., had to be established." [19]

4. Technical support services were provided to the Quality and Reliability Assurance Laboratory at the Marshall Center from August 1, 1971 to April 15, 1974 under Contract No. NAS 8–21806 with Federal Electric Corporation. [20] Generally, the services are classified as within the technical and engineering category, encompassing tasks ranging from vehicle checkout station preliminary design to review and evaluation of the overall Marshall Center Quality and Reliability program.

The contract contained the typical day-to-day administration and technical direction provisions, was implemented by issuance of Schedule Orders, and required observance of government regulations, standards of personnel competency, and substantial record keeping. The Responsible Official's letter of appointment provided for additional controls, such as monitoring technical aspects of the work, interpretation of data and technical portions of the contract Scope of Work, clarification of requirements, establishment of priorities and work sequence, approval of Contractor travel, authorization of overtime and the appointment of Technical Monitors as necessary.

Similarly, the letters of appointment to Technical Representatives authorize them to

"appoint Technical Monitors as necessary to provide operational assistance and support; prepare and issue supplementary Technical Directors to provide more specific details for work covered by the Schedule Order; provide necessary direction on technical aspects of the work; interpret data and the technical portions of the contract Scope of Work; clarify requirements and otherwise assist the contractor to understand the nature and extent of the work assigned; establish priorities and sequence of work; and through his monitors, provide continued surveillance of the contractor in his area and prepare and submit monthly evaluation reports to the Technical Evaluation Coordinator." [21]

A substantial number of high level Government Officials were thus authorized to, and did, establish the Contractor controls noted above.

5. Contract No. NAS 8–20073, effective April 1, 1965 to July 31, 1971 with Brown Engineering Company provided technical support services to the Propulsion and Vehicle Engineering Laboratory at the Marshall Center. More specifically, Brown Engineering supplied conceptual and preliminary design studies, vehicle systems engineering, structural research and development systems, sub-systems and component testing, propulsion and mechanical systems research and development, materials research and development, program coordination, engineering and documentation and fabrication. It was a typical manhour level-of-effort contract containing both the basic operational administrative provisions as well as the more restrictive terms found in the early contracts.

The follow-on is current [22] Contract No.

19. *Id.*, at 18–19.

20. Contract No. NAS 8–21806 was a follow-on to Contract No. NAS 8–20412, also with Federal Electric, which is discussed *infra* at pages 208–209, because NAS 8–20412 presents additional questions relating to Pellerzi Element 1, On-Site Performance, and Element 2, Government Furnished Equipment.

21. Report on: Federal Electric Corporation Contract No. NAS 8–21806, by the U. S. Civil Service Commission, May, 1974 at pages 19–20.

22. For purposes of continuity, those contracts in force at the time of the Commission's investigation are hereinafter referred to as "current" or "currently in effect" although some of the contracts may no longer be in effect.

NAS 8–21804, also with Brown Engineering Company, effective August 1, 1971 through July 31, 1974. Essentially the same services were performed under this contract as under NAS 8–20073, and the same basic operational structure was utilized. The report for NAS 8–20073 states:

"Note: This contract is identical, in every essential detail, to contract NAS 8–21804 currently in force * * *. Therefore, the write-up for NAS 8–21804 will apply to this contract as well, except where noted." [23]

Pertinent to this analysis is the statement that the NAS 8–20073 "contract terms were more restrictive with respect to the contractor, than is the present contract." [24] Staffing Plan requirements and prior approval thereof, and prior approval of key personnel diversion were cited as examples of the more restrictive nature of the earlier contract.

The Commission found "[t]he terms of the contract and the manner in which the service is performed has [sic] been carefully programmed to avoid the appearance of direct supervision by civil service personnel over contractor employees or vice versa." [25] However, the Commission also opinioned that notwithstanding the apparent lack of direct supervision, it was necessary to

"take notice of the machinery and procedures set up to transfer work from Government Sources where it originates to the contractor work force where it is performed and back to the Government." [26]

An extensive review of the elaborate paper process network by which the Contractor is instructed as to the work to be done was then undertaken.

6. Contract No. NAS 8–18405 with Computer Sciences Corporation, effective from July 1, 1966 to July 31, 1971, supplied technical support services to the Computation Laboratory. Specific areas receiving support services were identified in the Appendices as the Resources Management, Data Systems Engineering and Special Projects Offices; and the Digital Projects, Data Reduction, Simulation, Engineering Systems and Industrial Systems Branches. It was a manhour, level-of-effort contract activated by Schedule Orders, supplemented by Technical Directives, and, occasionally, by verbal directives arising during meetings. The contract contained the more restrictive early contract reporting, policies and procedures, personnel, hours of work and overtime provisions. All work instructions were passed on to Contractor management by Civil Service personnel.

The Commission summarized the Government monitor network as follows:

"Thus, through a 50 + 'Government Monitor' network, which is a ratio to the contractor work force of 1:10, a work request is prepared by the customer; analyzed by the civil service monitor to determine manhours, cost and time; further analyzed by the contractor supervisor; returned to civil service for approval or disapproval; and back to the contractor for performance. In the process, 'coordinating' meetings were held to clarify requirements, resolve problems, etc. Once the work was in process, it was 'monitored' by civil service personnel from start to finish product." [27]

The Commission also observed at page 32 of the Report that:

"[T]he agency's instructions, as well as local instructions from MSFC, caution

23. Report on: Brown Engineering Company, Inc. Contract No. NAS 8–20073, by the U. S. Civil Service Commission, May, 1974, at page 5.

24. Id., at 11.

25. Report on: Brown Engineering Company Contract No. NAS 8–21804, by the U. S. Civil Service Commission, May, 1974, at page 17.

26. Id., at 17–18.

27. Report on: Computer Sciences Corporation Contract No. NAS 8–18405, by the U. S. Civil Service Commission, May, 1974, at page 29.

Government officials to guard against establishing employer-employee relationships. As a result, contractor employees occupy separate quarters, plainly marked with their own signs, and elaborate system for transmitting work instructions by written directives and monitoring the work through a network of quasi-supervisors has been set up to avoid direct day-to-day supervision by Government employees over contractor employees."

Current contract No. NAS 8–21805, effective August 1, 1971 through July 31, 1974, also with Computer Sciences Corporation is a follow-on to NAS 8–18405 providing essentially the same support services. Although the more restrictive contract provisions were eliminated from NAS 8–21805, the work procedures are largely unchanged.

The Commission prepared a full report on NAS 8–21805, finding that while no instances of direct supervision were noted,

"an elaborate machinery set up by the contract gives management effective control over the contractor by stipulating what is to be done * * *, when, and in what manner; by specifying proficiency levels for contractor employees; by requiring a staffing plan; by setting man-hours; and by evaluating each technical directive." [28]

Approximately 77 civil service employees in the Computation Laboratory were identified as being involved in some phase of the management, supervision, monitoring or review of NAS 8–21805.

7. Current contract No. NAS 8–21809, effective August 1, 1971 through April 15, 1974, is a follow-on to No. NAS 8–20083, effective March 16, 1965 to July 31, 1971. Both are with Hayes International Corporation providing technical support services to the Marshall Center Product Engineering and Process Technology Laboratory, and include essentially the same work functions, namely: Tool and Equipment Engineering, including mechanical tool modification and maintenance, plant engineering design support, and tool and equipment design for experimental research projects and phototype vehicles; Program support consisting of data processing and program tool and component warehousing; Documentation Control including documentation processing and engineering configuration control services; and Research and Process Technology consisting of applied research in welding development, experimental and applied research in electrical/electro-mechanical development, and methods research and development. Material Handling of Critical Hardware was added to the current contract by modification in January, 1973.

These two contracts are analyzed together inasmuch as "[t]he report with respect to the current contract, i.e., NAS 8–21809, is applicable to this contract." [29] Both contracts were activated by Schedule Orders and Technical Directives. Similarities were found by the Commission in the suggested minimum capabilities required in the RFP for NAS 8–21809 and the minimum capabilities required for employees under NAS 8–20083. Additionally, NAS 8–20083 contained the more restrictive provisions common to early NASA contracts such as: detailed reporting requirements, significant controls on Contractor employees by the Government Contracting Officer including approval of an initial staffing plan and consent before diversion of key personnel, and prior approval of the Contractor's policies and procedures plan affecting personnel qualifications, salaries, wages and administration.

Parallel Civil Service work forces were engaged in functions similar to those of Contractor employees to the extent that the Commission found that "much of the work is performed by either work force depending upon capability, workload, and coordi-

28. Report on: Computer Sciences Corporation Contract No. NAS 8–21805, by the U. S. Civil Service Commission, May, 1974, at pages 19–20.

29. Report on: Hayes International Corporation Contract No. NAS 8–20083, by the U. S. Civil Service Commission, May, 1974 at page 11.

nation factors." [30] The contracts themselves and the manner of performance thereunder, however, are "carefully programmed to avoid the appearance of direct supervision over contractor employees." [31]

Government supervisors were found to "(1) Describe and define the work to be done in writing and in discussion with contractor supervisor; (2) Specify the number of manhours and the amount of money allotted for each function or task; (3) Specify materials to be used; (4) Approve overtime and travel; (5) Establish deadlines for the contractor's performance during and upon completion of each work assignment." [32]

Many of the Contractor employees have been working continuously at the Marshall Center under these two contracts since 1965. In summarizing its findings with respect to Pellerzi Element 6, the Commission investigators stated:

"Government supervisors outnumber contractor supervisors and the Government influences the number and kinds of positions, initial selection of employees, directs increases or decreases in contractor work force, controls the number of manhours, money, travel, and overtime, and the kinds of material used." [33]

8. Contract No. NAS 8–20055, effective March 1, 1965 through July 31, 1971, and the current follow-on, Contract No. NAS 8–21812, effective August 1, 1971 through July 31, 1974, both with Sperry Rand Corporation, provide for technical support services to the Astrionics Laboratory at the Marshall Center. The Scope of Work involves a wide variety of research, design and documentation, component evaluation and testing.

The typical administrative and control provisions are present in both. The earlier contract, NAS 8–20055, also imposes additional controls, *e.g.,* detailed reporting requirements, permission to the Government or a successor Contractor to hire employees upon expiration or termination of the contract, prior approval of a staffing plan, personnel policies, and diversion of key personnel by the Contracting Officer.

Both contracts were activated by Schedule Orders. Technical Directives are issued and discussed between the Contractor and NASA technical people, and joint technical meetings held frequently. The Commission found that the policy behind the operational process

"is to prevent employer-employee relationship by prohibiting work assignments being made directly to contractor personnel and interim direction and control of such work by Government Representatives, except as between the Government's and the Contractor's supervisors." [34]

Thus, a paper process and supervisor-to-supervisor relationship has been developed under both contracts to avoid direct work assignment to, and supervision over, Contract employees.

With regard to NAS 8–21812, the Commission commented that

"the Government (MSFC) controls the number of personnel employed under the contract, kind and volume of work assigned to the contractor, priorities, sequence and time schedules for accomplishing the work, the quality of work products, as well as overtime or travel necessary in performance of work under the contract." [35]

**30.** Report on: Hayes International Corporation Contract No. NAS 8–21809, by the U. S. Civil Service Commission, May, 1974, at page 18.

**31.** *Id.,* at 30.

**32.** *Id.* at 38.

**33.** *Id.* at 41.

**34.** Report on: Sperry Rand Corporation Contract No. NAS 8–20055, by the U. S. Civil Service Commission, May, 1974, at page 12. *See also,* Report on: Sperry Rand Corporation Contract No. NAS 8–21812, by the U. S. Civil Service Commission, May, 1974 at page 22.

**35.** Report on Contract No. NAS 8–21812, *supra,* at 22–23.

Substantially the same conclusions were reached as to NAS 8–20055.

9. Contract No. NAS 8–14109, effective April 1, 1965 to May 31, 1971, was with Management Services Incorporated of Tennessee. Its purpose was to provide technical support services to the Technical Services Offices at the Marshall Center, more specifically defined in Appendices A through G to the contract as including vehicle support services; photographic support; maintenance and repair of instrumentation, research, electronic, and mechanical laboratory equipment; chemical, hydraulic and ultrasonic purging; miscellaneous crafts; grounds and landscape maintenance; and logistic support. The Responsible Official, the Director of the Technical Services Office, activated the work by issuing Schedule Orders. The contract contained both the general and the more restrictive control provisions discussed *supra*.

The Commission's investigators reported that "[e]lements of control and supervision are apparent in several sections of the contract"; [36] and pointed to Article XIV (requiring final approval by the Contracting Officer of a comprehensive Staffing Plan and Implementation of Services, and prior approval of changes in key personnel, and labor rates and salaries (both for direct and indirect labor)); Article XV—Key Personnel Positions; Article XXIII—Wage Plan Approval; and the detailed Scope of Work Appendices. It concluded that "[i]n terms of [NAS 8–14109] the government does exercise a sizeable degree of supervisor direction." [37]

Current contract Nos. NAS 8–21769 and NAS 8–21771, both effective June 1, 1971 through May 31, 1974, and both with Management Services Incorporated of Tennes-

see, are follow-on contracts to NAS 8–14109 providing essentially the same support services.

As to NAS 8–21769, the Commission investigators identified and discussed 26 different areas in which "[e]lements of supervision and control are apparent in * * * the contract." [38] In terms of actual performance, it found and detailed evidence of government supervision and control, particularly with respect to (1) the assignment of work, (2) required Contractor reporting, and (3) the official and actual duties of Civil Service personnel in the Technical Service Office.

The services provided under NAS 8–21771 are further specified in Appendix A to the contract as: operating and maintaining one Grumman Gulfstream, one G–47, and one Beechcraft Queenaire type aircraft; providing food service and refreshments on flights; and servicing transient aircraft. The Commission found a "number of indicators, both in the terms of the contract and in the actual operations thereunder, which reveal the extent of Government direction of the contractor." [39] Specific examples of how three high level Marshall Center officials are involved in the day-to-day administration of the contract were reported. The Commission then summarized its findings as follows:

"[I]n view of the existence of an Air Operations Branch manned by civil service personnel and headed by a Supervisory Aircraft Pilot with supervisory duties and responsibilities over contractor operations set out in his official position description; the roles of the Director, Technical Services Office and Chief, Transportation Division; the System of Schedule Orders, Technical Directives and

36. Report on: Management Services, Incorporated of Tennessee Contract No. NAS 8–14109, by the U. S. Civil Service Commission, May, 1974, at page 21.

37. *Id.,* at 36. This report offers little discussion of the methods of operation under NAS 8–14109. However, the affidavits attached as Exhibits to the Report indicate the process was not unlike that used in other Marshall Center offices.

38. Report on: Management Services Incorporated of Tennessee Contract No. NAS 8–21769, by the U. S. Civil Service Commission, May, 1974, at page 19.

39. Report on: Management Services Incorporated of Tennessee Contract No. NAS 8–21771, by the U. S. Civil Service Commission, May, 1974, at page 9.

Task Orders; the many and frequent reports required of the Contractor; the designation of key personnel and qualification requirements; and the NASA Air Operations Manual, it is determined that the Government does exercise direction over the contractor. However, this does not extend to direct supervision of the contractor's employees." [40]

10. Contract No. NAS 8–21642, effective April 1, 1970 through May 31, 1973, with SysteMed Corporation,[41] and its follow-on, current Contract No. NAS 8–28469, effective June 1, 1973 through May 31, 1974, with the Kelsey Seybold Clinic are considered together since

"the SysteMed Corporation contract was essentially the same operation performed by essentially the same staff as the present Kelsey-Seybold Clinic * * *, the contract terms are very similar—the conclusions reached in the Kelsey-Seybold Clinic contract are applicable." [42]

The medical program support services include emergency and initial treatment, and first aid for illnesses and injuries to Marshall Center employees, Contractor employees and Center visitors; periodic physical examinations of all Marshall Center employees, including laboratory tests and X-rays; special monitoring physical examinations for Civil Service and selected Contractor personnel; and the identification, evaluation and control of health hazards.

The contracts contain the typical provisions for Schedule Orders, a Responsible Official, *etc.,* and "[t]he language of the printed contract[s] and the manner of performance thereunder is carefully programmed to avoid the appearance of direct supervision over contractor employees." [43] The more restrictive provisions common to

the early contracts have been transferred from the contracts themselves to the RFP which requires submission of data relating to the number and kinds of positions, detailed personnel qualifications and experience data, and qualifying policies and procedures. As to these requirements, the Commission concluded that the Government was in a position to, and did actually,

"direct, influence or control (1) the number and kinds of positions; (2) qualifications required of the persons to be employed [including the personnel selected for key positions]; (3) the sources from which employees were to be hired; and (4) the organization of the contractor's work force." [44]

Additionally, the Commission found substantial policy direction contained in the government's rather specifically written manuals and "Management Instructions". Reporting requirements and contract performance evaluation plans were also cited as indicia of government direction. The Commission concluded that:

"Although there is no direct supervision by Government personnel over contractor employees except through the established 'Government supervisor'—'contract supervisor' channels—the Government does control and influence the contractor operation in a number of ways, including the number and kind of positions, qualification requirements, selection of key personnel. In addition, the Government has issued certain program and management directives which are binding on the Medical Director. The Medical Director attends weekly meetings, annual conferences, makes monthly reports, and is evaluated by Government officials.

" * * * In short, the Medical Center at MSFC is Government controlled and

---

**40.** *Id.,* at 13.

**41.** Services contracted for under NAS 8–21642 had previously been supplied under NAS 8–14110, Appendix L, by RCA Service Company. NAS 8–14110 is considered *infra* at 209–212.

**42.** Report on: SysteMed Corporation Contract No. NAS 8–21642, by the U. S. Civil Service Commission, May, 1974, at page 7.

**43.** Report on: Kelsey-Seybold Clinic Contract No. NAS 8–28469, by the U. S. Civil Service Commission, May, 1974, at page 24.

**44.** *Id.,* at 29.

directed. But direct supervision of contractor employees is not present." [45]

## B. CONCLUSIONS AS TO CONTRACTS IN WHICH ONLY PELLERZI ELEMENT 6 WAS FOUND NOT PRESENT

In each of these 17 contracts, the Commission concluded that all Pellerzi Elements were present except the sixth—Government Supervision. As to that element, this Court found *supra* at page 196 that the test which should have been applied is one which necessitates a showing that the inherent nature of the services, or the manner in which they are provided, reasonably requires, *directly or indirectly*,[46] federal direction or supervision of contractor employees.

Moreover, "[t]he criteria must be realistically applied and the end-point determination reached on the basis of the over-all substance of the contract operations." [47] This realistic approach extends both to the terms of the contract, as well as the method of performance thereunder. In this regard, the Court finds that the early contracts are basically standard in form and essentially identical to those reviewed in the Pellerzi Opinion. The more restrictive and objectionable provisions have either been eliminated from the current contracts entirely, or incorporated into the Request for Proposal. Significantly, however, and as the Commission found, the manner of operation under the current contracts has remained largely unchanged.

■ When properly applied the sixth Pellerzi Element was, and is, present to a substantial degree in each of the 17 contracts analyzed above. Accordingly, notwithstanding attempts to program the contracts to avoid the appearance of an employer-employee relationship between NASA and Contractor non-civil service employees, this Court concludes that each of the 17 contracts reviewed above establishes the proscribed relationship, and therefore was, and is, null and void.

## C. CONTRACTS IN WHICH ALL PELLERZI ELEMENTS EXCEPT 1 AND 6 WERE FOUND PRESENT

The Court turns next to the three contracts which the Commission found all Pellerzi elements present except the first element, Performance On-Site, and the sixth element, Government Supervision. Regarding the first element, the Pellerzi Opinion states at page 27:

"'If the work is done upon the premises of the employer * * * the inference is strong that such workmen are the servants of the owner * * *.' *Restatement, Second, Agency,* § 220. Comment on Subsection 2(e)." [48]

The Mondello Supplement, at page 2, states further:

"The first four elements simply restate common experiences. Performance of the contract work by contractor employees on Government premises ordinarily facilitates supervision by Government employees."

Proper application of the sixth element, has, of course, already been thoroughly reviewed.

1. Contract Nos. NAS 8–20082, effective March 16, 1965 through July 31, 1971 and its follow-on, NAS 8–21810, effective August 1, 1971 through July 31, 1974, both with Northrop Services, Inc., are considered together. The Commission determined that NAS 8–20082 was essentially the same in its operation as the current contract, and that the conclusions reached were also the same. Both contracts provide for support services to the Aero-Astrodynamics Laboratory at the Marshall Center including oper-

---

45. *Id.,* at 41.

46. Emphasis Added.

47. Pellerzi Opinion at 21.

48. In the Opinion, this statement is actually made under the heading "Furnishings of office or working space". Pellerzi Elements 1 and 2, Government Furnished Equipment, are commonly found together and the analysis by necessity overlaps. Also see analysis of NAS 8–14108 and NAS 8–20412 *infra* at 207–210.

ation of one aerodynamic testing facility, one atmospheric research facility, and engineering support in the following areas: aerodynamics, thermodynamics, astrodynamics and guidance theory, dynamics and control, aerospace environment, mission planning and light mechanics.

With respect to the first Pellerzi Element, the Commission found that the contracts are not performed on-site since the vast majority of the individuals performing work thereunder continue to be physically located at the company-owned facility in Huntsville Research Park and not at the Marshall Center. Technically, this conclusion is correct. However, the Court does note that the Commission also found that computer computational services provided by the Government on-site involved principal tools and equipment in the required performance of work under the contract.

As to the sixth Pellerzi Element, both contracts contain the general control clauses discussed *supra*. Examples of additional controls were pointed to in provisions requiring continuity of services, contractor reimbursement only upon approval of the Contracting Officer, personnel capable of performing in a manner acceptable to the Government, the retention of full personnel responsibilities by the Responsible Official for the function support in his office, and Government determination of what constitutes acceptable work. The Commission noted with respect to the sixth element:

"While it is possible to maintain that the Government cannot force, in terms of directly ordering, the contractor to perform in accordance with standards set by the Government, th[r]ough its option to renew the contract and through its evaluation-award for process, or through institution of default proceedings, does have a powerful tool with which to motivate the contractor to excellence (or at least satisfactory levels) of performance. The motivational factors are profit (award fee) and job (contract) retention." [49]

2. Under current Contract No. NAS 8–21811, Planning Research Corporation has provided support services to the Marshall Center's Systems/Products office since August 1, 1971. The services include preparation of technical specifications, system requirements, test verification requirements and plans, logistical plans, safety plans and study reports.

The Commission concluded the Performance On-Site element was not present since "on-site work has declined from eighteen percent in the first year of operation to zero percent in the current [1974] year." [50] The work is performed in Planning Research Corporation's offices in Huntsville, Alabama. The services provided were found to "represent an office-type operation and the office equipment furnished by the Government represents a substantial portion of the office equipment required." [51]

As to the Government Supervision element, the standard controls provisions are present in the contract's terms. The Commission found the Contractor Manager's statement of operations to be fairly descriptive:

"The Government provides manhour and cost estimates which control the number of employees and the cost of operation; work is received in the form of a written directive; progress of work and/or problems may be discussed between contractor task personnel and civil service personnel; and if any changes are made in directions, approval must first be obtained from the Office of the Responsible Official." [52]

The Responsible Official controls work "by the issuance of schedule orders, supple-

---

49. Report On: Northrop Services Inc. Contract No. NAS 8–21810, by the U. S. Civil Service Commission, May, 1974, at pages 15–16.

50. Report On: Planning Research Corporation Contract No. NAS 8–21811, by the U. S. Civil Service Commission, May, 1974, at page 4.

51. *Id.*, at 5.

52. *Id.*, at 11.

mented by technical directives and monitored by technical representatives. He controls the money, manhours, establishes priorities and sequence of work, approves travel, authorized overtime, resolves technical problems and evaluates contractor performance." [53] Additional controls, generally of the monitoring and evaluation category, are exercised by the Civil Service support staff.

The Commission report summarizes the investigation as to the sixth Pellerzi Element as follows:

"Direct supervision by civil service personnel over contractor personnel or vice versa is known by both sides, i. e., contractor and civil service, to be improper, and the paper and procedural processes are set up to avoid this. Controls are exercised through supervisors on both sides. The Responsible Official is still held responsible and accountable for the functions assigned to his office—Whether accomplished by the civil service work force or the contractor work force—both under his direction. From a practical standpoint there is virtually no difference in the manner in which his direction over the two work forces is exercised. In both instances the Responsible Official gets the job done by assigned subordinate supervisors. He doesn't directly supervise employees on either side. The Contractor Manager in this instance is not different as far as the day to day work is concerned, from a Division Chief or Branch Chief." [54]

 The Court is of the opinion that neither the Northrop contracts nor the Planning Research Corporation contract are substantially different, either by the contract terms or the manner of operation thereunder, than those contracts found *supra* to have established a relationship tantamount to that of employer-employee. When realistically viewed, the inherent nature of these services, as well as the manner in which they are provided, does require,

directly or indirectly, Government Supervision and Control over the Contractor's employees. The sixth Pellerzi Element, when properly applied, is present to a substantial degree. And while the work is technically performed off-site, that element, as it exists in these three contracts, is not, standing alone, sufficient to foreclose the conclusion that the prohibited employer-employee relationship did not previously, and does not now, continue to exist. The Court therefore concludes that these three contracts were, and are, null and void.

## D. CONTRACTS FOUND TO CONTAIN ALL PELLERZI ELEMENTS EXCEPT 1, 2 AND 6

Two contracts were found by the Commission to contain only three of the Pellerzi Elements. It concluded that the first element, Performance On-Site, the second element, Government Furnished Equipment, and the sixth element, Government Supervision, were not present.

Since proper application of the first and sixth elements has been reviewed *supra,* the Court turns directly to consideration of the second element, Government Furnished Equipment. The Pellerzi Opinion discusses this element in the context of a task assignment of such a highly specialized nature that it would be impossible for the Contractor to supply the necessary equipment.[55] Again quoting from the *Restatement, Second, Agency,* the Opinion, at page 26, sets forth the following view:

" '[I]f the worker is using his employer's tools or instrumentalities, especially if they are of substantial value, it is normally understood that he will follow the directions of the owner in their use, and this indicates that the owner is a master. This fact is, however, only of evidential value.' *Restatement, Second, Agency,* § 220. Comment on subsection (2)k."

The Mondello Supplement simply observes at page 2, that "[u]se by contractor

---

53. *Id.,* at 13.

54. *Id.,* at 15.

55. In many instances, it would also be economically unwise for the Government to indirectly stand the cost through Contractor acquisition.

employees of Government-furnished equipment creates the same facility for supervision, and warrants similar close inquiry."

1. Under the Rust Engineering Contract, NAS 8–14108, effective March 1, 1965 to January 13, 1969, technical support services identified in Appendix A as Engineering Design, in Appendix B as Master Planning, and in Appendix C as Construction Inspection of Facilities, were supplied to the Facilities and Design Office at the Marshall Center.

The Commission's conclusion as to Performance On-Site was based on the fact that 81% of the work was performed off-site, namely at the Contractor's plants in Huntsville. The Report on NAS 8–14108 also indicates that it was the Engineering Design and Master Planning work that was done off-site, while the Construction Inspection of Facilities work was performed on-site. The contract, provided, however, that the Rust Company was to be paid $3.75 per square foot by the Government for the office space utilized to perform the off-site work.

With respect to the second element, Government Furnished Equipment, the Contractor apparently supplied the principal tools and equipment for the work performed under Appendices A and B, although the contract did provide that the Government was obligated to provide "all computer and allied services required in the performance of the services covered by the contract." [56] Most of the equipment used for surveying was provided by the Government. However, because "[t]he Staffing Plan shows that the surveying activity (civil drafts (surveys)) to be a two man level of effort during the last in-force contract year of this contract," [57] the Commission concluded that as to this activity, the second element was not present to a substantial degree.

As to the sixth element, NAS 8–14108 contained both the general and the more restrictive Government control provisions discussed in detail *supra*. It does not appear that the method of operation under this contract was much different than under the other early contracts reviewed above. The Commission found some 22 different provisions evidencing elements of Government control and direction imposed by the terms of the basic contract and its modifications. Additionally, it noted that no provision was made for re-delegating the Responsible Officer's day-to-day administration and technical direction responsibility, and that therefore the capacity to establish standards of performance and to determine that satisfactory performance had been achieved was implicit. The investigators concluded that "[i]t is apparent that according to the terms of the contract the Government does establish standards of performance and the Government ultimately decided whether or not work had been accomplished in a satisfactory manner", [58] but that supervision of contractor employees was not present to a substantial degree.

2. Contract No. NAS 8–20412, effective July 11, 1966 through July 31, 1971, with Federal Electric [59] provided support services to the Marshall Center Space Flight Center Reliability Program. The work supplied is described in general terms in Appendix 1 and the accompanying task statements as including "the review, evaluation and recommendation for corrective action with respect to other contractors as well as the MSFC and NASA reliability requirements." [60]

---

56. Report On: The Rust Engineering Company Contract No. NAS 8–14108, by the U. S. Civil Service Commission, May, 1974, Exhibit A.

57. *Id.,* at 6.

58. *Id.,* at 21.

59. NAS 8–20412 actually preceded Contract NAS 8–21806, also with Federal Electric. NAS 8–21806 is discussed *supra* at 198–199, because

the only issue with respect to it concerned the presence of Government Supervision, and it was performed at the Marshall Center.

60. Report On: Federal Electric Corporation Contract No. NAS 8–20412, by the U. S. Civil Service Commission, May, 1974, at page 2.

The contract was performed at the Contractor's facilities in Huntsville, Alabama as well as at other Contractors' plants in California. The Commission reported that

"[s]ince the inspection and evaluation function could only be performed at the site where the work was being done (other contractor's plants), the conclusion is that this was not 'on site performance.' " [61]

With respect to Government Provided Equipment, the second Pellerzi Element, the Commission found that the Contractor furnished the necessary equipment and supplies for its staff of 130 professional workers for work being done in Huntsville, (although these expenses were apparently included in the cost plus award fee), but that at the other locations, the government did supply equipment, materials and services. The government was also obligated to furnish, at no cost to Federal Electric, all the necessary computer services.

In a preliminary statement as to its findings on the sixth Pellerzi Element, the Commission report states the

"basic instruction used by the contractor employees in performing [review, evaluation and recommendation of corrective action services] emanated not from his employer of record, the Federal Electric Corporation, but from the Government employer, NASA." [62] .

The Commission found facts indicative of Government direction and supervision in the inherent nature of the services as well as in the manner in which the services were provided. The contract contained both the general, and the more restrictive Government control provisions, and "counterpart supervisors" were extensively utilized. The contract required, *inter alia*, progress, final, fund, overtime usage, and other reports; Contractor employee hiring by Government or successor Contractors; prior submission of staffing plans for approval; prior approval of key personnel diversion; and prior approval of personnel policies and procedures and overtime.

■ Contract Nos. NAS 8–14108 and NAS 8–20412 must be realistically viewed. The Court concludes that when the proper test is applied, direct or indirect Government direction or supervision of these Contractors' employees was present in each case to a substantial degree, and that the requirements of the sixth Pellerzi Element are satisfied. The Court further concludes that although the facts adduced as to each contract indicate some level of Government involvement, the Commission correctly determined that the Performance On-Site and the Government Furnished Equipment elements were not present to a substantial degree. While the likelihood of overall Government supervision is diminished by the absence of these two elements, Contract Nos. NAS 8–14108 and NAS 8–20412 must still be held to have created a relationship between the Contractors' employees and the Government tantamount to that of employer-employee.

### E. CONTRACT NOS. NAS 8–14110 AND 8–21808

The remaining two contracts investigated at the Marshall Center, NAS 8–14110 with RCA Service Company, effective April 1, 1965 through November 11, 1971, and its successor, current contract NAS 8–21808 with Hayes International Corporation, effective November 11, 1971 through November 30, 1974, are considered apart from the other contracts because of the issues raised by the Commission Reports.

The support services, itemized in Appendices A–M in NAS 8–14110, and Appendices A–I in NAS 8–21808, include the areas of telecommunications, reproduction, graphic arts and model design, technical publications, technical documentation repository, protective and custodial services, maintenance and repair of photographic equipment, safety engineering, refuse collection,

---

**61.** *Id.,* at 4.

**62.** *Id.,* at 8.

laundry and medical services and technology utilization.[63]

Apparently because of the wide variety of services supplied under these contracts, the Commission investigators attempted to review and apply the Pellerzi Standards independently to each Appendix of NAS 8–21808. Without specifically adopting the Report on NAS 8–21808, the Commission noted in its Report on NAS 8–14110 that the testimony of Marshall Center personnel interviewed was "to the effect that there were no significant differences in operations under this contract and successor contracts—the terms of [NAS 8–14110 with RCA] are considerably more restrictive." [64]

Technical Publication support (which involved technical writing, editing and typing of scientific and technical reports, *etc.,* furnished to the Contractor in rough draft), Laundry and Refuse Collection services were correctly determined to be performed off-site, Pellerzi Element 1; the latter two services were also correctly found not to utilize principal tools and equipment furnished by the Government, Pellerzi Element 2.[65]

The Commission investigators concluded that the third Pellerzi Element, Integral Effort, was not present with regard to the Photo Repair, Custodial, Laundry and Refuse Collection services. That element has not been heretofore reviewed and requires that

"[s]ervices are applied directly to integral effort of agencies or an organizational subpart in furtherance of assigned function or mission."

Plaintiffs point to the following Article, apparently a stock contract provision, contained in all the contracts:

"The contractor fully recognizes that the services covered by this contract are vital to the NASA mission * * *"

They argue the services rendered are basically identical to those found to meet the Integral Effort test in other contracts reviewed,[66] and that it is only necessary to show the work is related to a Federal function, and to NASA's assigned mission.

Government defendants and defendant-intervenor NCTSI view these services as house-keeping functions. They contend that the third element requires a determination of whether the function performed was essential to the Marshall mission, and that the emphasis should be placed on work "applied directly" to an agency's primary mission. They assert that plaintiffs' interpretation would, by definition, apply to all contracts.

The Pellerzi Opinion states at page 21: "There has never been any dispute that support service contractor employees, working directly in support of agency missions, meet [the 5 U.S.C. § 2105(a)(2) criterion]. This criterion provides essentially the same yardstick as the common-law test of whether or not the work performed is part of the regular business of the employer. (*Restatement Agency*, § 220–h)." [67]

Unquestionably, Contractor employees are, in the broad sense, engaged in the performance of a Federal function. The

**63.** Medical support services supplied under Appendix L to NAS 8–14110 were subsequently awarded to the SysteMed Corporation under NAS 8–21642. Its successor is NAS 8–28469 with the Kelsey Seybold Clinic. Both subsequent contracts are reviewed *supra* at 203–205.

**64.** Report On: RCA Service Company Contract No. NAS 8–14110, U. S. Civil Service Commission, May, 1974, at page 6.

**65.** See discussion of Pellerzi Elements 1, *supra* at 205–206, and 2 *supra* at 207–208.

**66.** This broad contention appears to be unfounded. Plaintiffs offer no specific examples and it appears to the Court that the Commission investigators consistently differentiated between support services of the housekeeping and technical variety when applying the Integral Effort element. *See* n.69, *infra.*

**67.** The 5 U.S.C. § 2105(a)(2) criterion referred to requires that an "employee" must be an officer or individual who is—"engaged in the performance of a Federal function under authority of law or an Executive Act."

inquiry, however, does not, as plaintiffs contend, stop there.

The common-law test referred to in the Pellerzi Opinion, "regular business of the employer", is further explored in that Opinion at page 33 as follows:

"If support services contracting is an integral part of Goddard Operations required to accomplish the NASA mission assigned to its various organizational divisions, it necessarily follows that contractor personnel are performing the regular work of the agency."

The Mondello Supplement at page 2 offers only the following example (given in the context of approaching contract review reasonably) for clarification:

"Since Government agencies are responsible for accomplishing their missions, application of contract services to agency efforts integral to accomplishment of the basic mission is likely to be closely supervised."

The Commission's interpretation of the third Pellerzi Element is perhaps best summarized in its Report on NAS 8–21808, wherein it concluded that a function is not essential to the Marshall mission when

"1. It is not a part of a function related to the MSFC mission.

2. It represents a complete function within itself and does not require support from any other function or office (it stands alone).

3. It does not require continuing day-to-day relationships with MSFC personnel." [68]

■ By placing the emphasis on the independent and secondary nature of the function as it did, the Commission correctly interpreted the third Pellerzi Element. The

Commission was also correct in concluding that the Integral Effort element was not present with respect to the Photo Repair, Custodial, Laundry and Refuse Collection services provided under NAS 8–14110 and NAS 8–21808.[69]

Similarly, the fourth Pellerzi Element, Comparable Services Performed by Civil Service Employees, was found not to be present as to the Photo Repair, Custodial, Laundry and Refuse Collection services. Application of the fourth element with respect to these particular contract services is simple and straight-forward. An in depth analysis of the fourth element would, therefore, serve no useful purpose and the Commission's conclusions as to these two contracts are adopted.

The fifth element, Service Beyond One Year, was found in all contract Appendices. The sixth element, Government Supervision, was found not to be present in any of the NAS 8–21808 appendices; it is the only element substantively reviewed in the NAS 8–14110 Report.

Both NAS 8–14110 and NAS 8–21808 include the standard provisions for Work Orders, a Responsible Official, Technical Directives, etc. NAS 8–14110 also contains the typical early contract provisions covering continuity of services, staffing plans and implementation of services, key personnel, contractor policies and procedures, overtime, qualifications required for positions within "Categories of Direct Labor" and assignment of certain employees.

The Commission concluded that

"the language of [NAS 8–14110] is considerably more restrictive than current contracts and in effect permitted the

---

**68.** Report On: Hayes International Corporation Contract No. NAS 8–21808, by the U. S. Civil Service Commission, May, 1974, at page 10.

**69.** The analysis table attached to the Commission's Summary Report seems to indicate that the investigators were not entirely sure (notwithstanding their individual Reports) that those general maintenance type services supplied under NAS 8–14109 and NAS 8–21769, discussed *supra* at 203 met the Integral Effort element. Their ultimate conclusion was

"YES?". Had the conclusion been "NO?", the third element would have been the only one not present, unlike the situation under NAS 8–14110 and NAS 8–21808. Since the maintenance services supplied under NAS 8–14109 and NAS 8–21769 can also be distinguished, the Court believes the Commission's conclusion was correct.

government to have a degree of control over the staffing and compensation of contractor's workforce, as well as review over personnel policies affecting contractor employees." [70]

The Commission also found examples of government supervision and control over Hayes International in the terms of NAS 8–21808, although "the language of the printed contract and the manner of performance thereunder are carefully programmed to avoid the appearance of direct supervision over contractor employees." [71] Those examples included government controls over Contractor employee working hours, and requirements for quality assurance programs, and submission of monthly progress and financial reports (and other reports as required).

The procedures under both NAS 8–14110 and NAS 8–21808 include: written task directives with approval upon completion by the Task Monitor; acceptance or rejection of oral requests for field maintenance work by signing of the Work Order; submission of a weekly report by the Quality Control Representative which in turn is checked by the Task Monitor; control of the Communications Division functions through management plans, control documents and standard operating procedures; and, weekly updating of task workloads subject to review by the Task Monitor. There are, of course, variations to the general practices, and in some instances, depending upon the particular support service, additional controls. The only changes in the administration of current contract NAS 8–21808 seems to be that more graphic arts, technical publication and documentation repository work has been transferred to Hayes International, and a more definitive division between contractor and government exists in terms of the kind of work being performed and the physical location of the employees. The Commission noted that

"[w]ith respect to each Appendix, however, the pattern of Government supervisors supervising contractor supervisors is firmly established. In this connection, it is significant that Government supervisors issue instructions in writing as to the work to be performed, and have regular meetings with contractor supervisors to clarify written instructions, answer questions, resolve problems, or check up on customer complaints. Technical representatives 'monitor' work in progress and upon completion. The contractor is bound by certain MSFC policy directives, operating procedures and manual instructions. The contractor must submit progress reports and financial reports. His performance is evaluated continually by civil service personnel. A parallel workforce, which provides as a minimum one Government Supervisor for each contractor unit has been established to assure that the contractor's performance in all work areas measures up to the standards and specifications prescribed of the civil service organization." [72]

Making no comment on whether an Appendix-by-Appendix review is a reasonable approach to support service contract review, the Court concludes that, when realistically viewed, the Photo Repair, Custodial, Laundry and Refuse Collection services provided under NAS 8–14110 and NAS 8–21808 do not create the proscribed relationship. However, with respect to the balance of the services supplied, the Court further concludes that NAS 8–14110 and NAS 8–21808, by the terms thereof and the performance thereunder, do establish the proscribed employer-employee relationship.

## IV. CONTRACTS AT GOVERNMENT–OWNED CONTRACTOR–OPERATED FACILITIES

The last eight contracts investigated by the Commission are Government-owned Contractor-operated (GOCO) contracts pro-

---

**70.** Report on Contract No. NAS 8–14110, *supra,* at 10.

**71.** Report on Contract No. NAS 8–21808, *supra,* at 24.

**72.** *Id.,* at 46–47.

viding support services at the Mississippi Test Facility (MTF) at Bay St. Louis, Mississippi and the Michoud Assembly Facility (Michoud) at New Orleans, Louisiana. Government defendants contend that these are mission-type contracts differing from the level-of-effort contracts reviewed above in that full management responsibility for operation of the facility rests with the Contractor, the contracts are not dependent upon Schedule Orders and Technical Directives (although it appears that both may still be issued), manhours and dollar ceilings are not contained in the initial contract, but may be subsequently negotiated, and no civil service workforce is present at the site. Government defendants, and defendant-intervenor NCTSI urge that the Commission's conclusions as to these GOCO contracts be affirmed.

Plaintiffs' position is that these contracts, even if they are mission-type GOCO contracts, are similar in form and substance to the level-of-effort contracts, and have not been authorized under 42 U.S.C. § 2473(b)(2). Plaintiffs argue that Government defendants originally saw no distinction since they determined the GOCO contracts were encompassed by the Court's Order of November 30, 1973 and instituted investigation. Great emphasis is placed upon the fact that the "satellite facilities" are owned by the Government which also supplies all of the tools, equipment and working space, and that Government defendants incorrectly argue there is no civil service workforce on site. Plaintiffs again challenge the Commission's conclusions as to each of the eight contracts.

## A. CONTRACTS AT THE MISSISSIPPI TEST FACILITY

Under Contract Nos. NAS w–410, effective July 1, 1963 to June 30, 1970, and its follow-on NAS 8–26010, effective July 1, 1970 to July 31, 1971, the General Electric Company provided support services ranging from technical support to operation of maintenance shops and institutional services at the MTF. Subsequently, these services were split and covered upon separate competitively negotiated contracts, General Electric being awarded current Contract No. NAS 8–27750, effective August 1, 1971 through July 31, 1974, for technical support services. Global Associates was awarded current Contract No. NAS 8–26896, effective July 12, 1971 through July 11, 1974, for facility operating services.

The Commission concluded that inasmuch as NAS w–410 and NAS 8–26010 with General Electric were operated in much the same manner as current contracts NAS 8–27750 and NAS 8–26896, the findings with respect to the current successor contracts should also apply to the earlier contracts. All four were found to meet all the Pellerzi Elements except the sixth, Government Supervision. Additionally, it was determined that the third element, Integral Effort, was not present in NAS 8–26896, and therefore was not present in those portions of NAS w–410 and NAS 8–26010 relating to facility maintenance work.

Notwithstanding the fact that the Commission's Report, and the parties' memorandum have treated NAS 8–27750 as a mission-type contract, like the other three, it appears to the Court that NAS 8–27750 is in fact more like the level-of-effort contracts reviewed *supra*.[73]

1. Government Supervision was found not to be present under NAS 8–27750. This is a manhour contract. Responsibility for day-to-day administration and technical direction rests with the Responsible Official, who in turn selects civil service staff members as Achievement Co-ordinators and Achievement Monitors to assess performance against pre-established criteria. A Technical Work Request (TWR) or a Test/Operations Plan originates with specially designated civil service personnel. These requests specify the number of manhours, materials, dollar ceilings, delivery dates, quality level requirements, over-

---

**73.** Report On: General Electric Company, Mississippi Test Facility, Bay St. Louis, Mississippi, Contract No. NAS 8–27750, by the U. S. Civil Service Commission, May, 1974, and the exhibits, including the contract itself, attached to the report.

time authorized and special reporting requirements. Before final issuance, requests are

"reviewed by NASA/MTF personnel for completeness, clarity, scope determination, and elimination of any personal services features. Detailed instructions necessary to accomplish all tasks are generated by contractor management and supervision and transmitted down to performing employees." [74]

Position classifications setting forth minimum education and experience requirements were included in the RFP. The contract contains a key personnel provision, and the Contractor must inform the Government of certain key personnel assignments. However, no staffing plan was required, no government influence is exercised in the selection, salaries, removal, reassignment or disciplinary action of Contractor employees, and work assignments are influenced only to the extent a particular work request may necessitate performance by uniquely or special skilled personnel. Affidavits of the Government monitors indicate that the ratio of Government monitors to Contractor employees is extremely low.

The Commission found that

"the functions of the Mississippi Test Facility which are described in the Charter and delegated to the Director, have been redelegated by contract to the General Electric Company. MSFC–MTF civil service personnel appear to function in the broad sense as 'Business Managers' and 'Co-ordinators' rather than technical supervisors. They apparently perform no substantive programs operations." [75]

■ Accordingly, after a review of the Commission's investigative report and supporting materials, the Court finds that although NAS 8–27750 is, in form, a level-of-effort type contract, and is therefore, as plaintiffs contend, similar to the contracts

reviewed *supra,* the method of performance under it is distinguishable. The sixth Pellerzi Element, when properly applied, is not present to a substantial degree. And further, although five of the six Pellerzi Elements are present, when realistically viewed, the proscribed employer-employee relationship cannot be said to exist under NAS 8–27750.

2. As noted above, neither the Integral Effort nor Government Supervision elements were found to be present under NAS 8–26896.

With respect to the third element, Integral Effort, the Commission recognized the standard contract provision, "[h]owever overworked the phrase might be * * * must be given due weight as a part of the contract." [76] It found that

"while a case can be made that the services (or most of them) provided by this contract are legitimate functions, there was no indication the services applied to an integral effort of MTF—since MTF has no visible Civil Service Organization for carrying out the functions or services." [77]

Transportation services are apparently the only services supplied under NAS 8–26896 that have ever been provided by civil service employees.

Turning now to the sixth element, Government Supervision, under NAS 8–26896 Global Associates

"is to provide the services required on a mission basis; however, since the extent and exact nature of these services cannot be determined in precise detail, a man-hour and dollar ceiling was established through the course of negotiations, and subsequently set forth in ARTICLE II of the resultant contract. The establishment of these ceilings provides the upper limit or scope of the contract. The purpose of the so defined 'scope' is to estab-

---

**74.** Report On: Contract No. NAS 8–27750, *supra,* at 14.

**75.** *Id.,* at 14–15.

**76.** Report On: Global Associates Contract No. NAS 8–26896 by the U. S. Civil Service Commission, May, 1974, at pages 7–8.

**77.** *Id.,* at 8.

lish a definitive manner that point wherein the Contractor has fulfilled his obligations under the contract." [78]

NAS 8–26896 does not specify personnel requirements in any fashion, either by number, skills, or skill levels.

It appears that the methods of securing NASA–MTF maintenance support services of this type were changed in 1971 when this contract became effective, and that issuance of Schedule Orders and Technical Directives was initiated. However,

"[t]he Contract instrument itself is the contractor's authorization to perform work. No form of a work ordering system is required in regard to the contractor's performance of repetitive services. However, a work order system for requesting non-repetitive services is employed." [79]

The contract was still viewed as a mission-type contract by the Commission investigators since "the Contractor is required to fully manage and discharge his operations and obligations under the contract; and to this extent, is not required to respond to Government issued Schedule Orders or Technical Directives." [80] The Commission concluded:

"Although the Government has imposed certain controls, such as frequent reports, including reports concerning work progress and status, as well as financial reports, the program evaluation procedures—for the most part the contractor apparently operates the facility and performs the services required by the contract on his own." [81]

 The Court finds that the Commission correctly applied the third Pellerzi Element and concluded the maintenance support services were not applied directly to integral effort in furtherance of the NASA–MTF mission. The Court also finds that Government Supervision was not present to a substantial degree in NAS 8–26896.

The Commission Reports on the early contracts, NAS w–410 and its follow-on, NAS 8–26010, both with General Electric, are not very enlightening,[82] except insofar as they report the contracts were mission-type contracts, and that detailed operating plans for implementation of services were drawn-up by the Contractor in consultation with the Contracting Officer, and subject to his approval. Both Reports urge that the findings made as to NAS 8–27750 and NAS 8–26896, should be applied.

Following this recommendation, and notwithstanding the differences observed above in the current successor contracts, the Court concludes that NAS w–410 and NAS 8–26010, and their successors, NAS 8–27750 and NAS 8–26896, do not establish a relationship tantamount to that of employer-employee between NASA and the Contractors' non-civil service employees.

## B. CONTRACTS AT THE MICHOUD ASSEMBLY FACILITY

The last four contracts reviewed pursuant to the November 30, 1973 Order, were for support services provided at Michoud. As to each, the Commission found that Pellerzi Elements 3, Integral Effort, and 6, Government Supervision, were not present to a substantial degree.

1. Under Contract No. NAS 8–14017, effective March 1, 1965 through May 31, 1971, and its follow-on, current Contract No. NAS 8–26887, effective June 1, 1971 to May 31, 1974, the Mason-Rust Company has provided plant operation support services at Michoud. These services include: transportation, security, fire protection, photograph-

78. Affidavit of William L. Goodrich, Contracting Officer, Exhibit A at page 7, attached to Report On: Global Associates Contract No. NAS 8–26896, *supra*.

79. *Id.*, at 16.

80. *Id.*, at 7; Report On: Contract No. NAS 8–26896, *supra*, at 3.

81. Report On: Contract No. NAS 8–26896, *supra*, at 14–15.

82. As to each, the Commission submitted a skeleton report, and a copy of the contract itself.

ic, medical, food, supplies, telecommunications, custodial, plant engineering and maintenance, and reproduction and documentation.

They are reviewed together since the Commission investigators determined that NAS 8–14017 "was operated in substantially the same manner as the present Mason-Rust, NAS 8–26887. Therefore, the findings with respect to the latter contract applies [sic] also to this contract." [83]

Looking first at the Integral Effort element, the standard contract clause recognizing that the services are "vital to the NASA mission" is present in both contracts. The Commission found that

"while the functions covered by [these] contract[s] are set forth in the Official Charter and responsibility for the operation of this facility has been delegated to the civil service Manager there is no indication that the services are applied to an integral effort. There are approximately 28 civil service employees not counting clerical support personnel located at the Michoud Assembly Facility. These employees are engaged in monitoring and evaluating the contractor's effort. They do not perform operating functions." [84]

The Commission concluded that "the Manager, Michoud Assembly Facility has redelegated the operation of the facility to the contractor." [85]

With respect to the sixth element, Government Supervision, both NAS 8–14017 and NAS 8–26887 are mission-type contracts for facility operating services. They are managed by broad "Statement of Work" which is included in the contract itself. Although there is a Responsible Official, charged with day-to-day administration and technical surveillance, neither Task Orders nor Work Directives are issued. Various Contractor reports are required, but there are no manhour controls. Evidence adduced during the investigation indicates that the Government

"does not control the number of employees employed by Mason-Rust, makes no determination of the kind of employee utilized under the contract, does not establish any of the qualifications of various employees and does not determine or specify the work assignments." [86]

The Commission concluded its Report on NAS 8–26887 (and by application on NAS 8–14017):

"[A]lthough the Government has imposed controls to assure that the contractor's operations are contained within the terms of the contract and performed according to acceptable standards there is no indication of supervision in the sense intended by this element of the standards." [87]

2. Operations and maintenance of all computing and associated equipment support services have been provided to the Michoud Computer Complex under Contract No. NAS 8–17203, effective January 8, 1966 through February 7, 1971, with Service Technology Corporation, and its current follow-on, NAS 8–26034, effective February 1, 1971 through June 30, 1974, with Computing and Software, Inc. The services include such items as computer operations and maintenance, logistic support, software systems maintenance, applications programming, consulting assistance to users, and general maintenance required to support a computer installation.

Since the Commission concluded that NAS 8–17203 was "essentially the same as contract NAS 8–26034, Computing and

83. Report On: Mason-Rust Company Contract No. NAS 8–14017, by the U. S. Civil Service Commission, May, 1974, at page 3.

84. Report On: Mason-Rust Company Contract No. NAS 8–26887, by the U. S. Civil Service Commission, May, 1974, at page 6.

85. Id., at 7.

86. Affidavit of Milton H. Kalskett, General Manager, Mason-Rust, at page 9, attached to Report On: Mason-Rust Company Contract No. NAS 8–26887, supra.

87. Report On: Mason-Rust Company Contract No. NAS 8–26887, supra, at 8.

Software, Inc., and the findings with respect to the latter apply to the operation of [NAS 8–17023]",[88] the contracts are reviewed together.

Like the previous two contracts, analysis of these contracts with respect to the Integral Effort standard must begin by noting that both contain the stock contract provision calling the services "vital" to the NASA mission. The Commission found:

"The services provided by this contract are considered by the terms of the contract * * * and the Responsible Official * * * essential to the 'NASA mission'. * * * However, the services cannot be considered part of an integral effort because the contractor performs all of the services. There is no civil service organization, nor civil service employees assigned as operating personnel."[89]

The Commission opinioned that while the services were properly included in the functional statement and within the responsibility of the Computer Complex Director, the

"actual operations of the facility, as well as operation and maintenance of Computing Services has been delegated by contract to Computing and Software, Inc. [and Service Technology Corporation.]."[90]

Turning to the Government Supervision element, the contracts reveal that day-to-day administration and technical direction rests with the Responsible Official. Both are mission-type contracts managed by a general "Scope of Work" with no manhour guidelines or limitations on the Contractors. There are no procedures for ordering work, such as through the use of Schedule Orders, Technical Directives, or other work requests.

The Commission thus concluded that

"the manner in which the contract is administered gives the contractor a free

hand in planning, organizing and performing the work to be done.

The controls instituted by the Government, e. g. reports, are considered to be after the fact and mainly for the purpose of evaluating the services rendered by the contractor."[91]

As to each of these four contracts, NAS 8–14017, NAS 8–26887, NAS 8–17203 and NAS 8–26034, the Court adopts the Commission's finding that the Integral Effort element was not present to a substantial degree. When the sixth standard is applied to these contracts, and operations thereunder realistically viewed, the Court further finds Government Supervision of Contractor employees was not, and is not, present. Having determined that Pellerzi Elements 3 and 6 are not present to a substantial degree, these contracts cannot be found to establish the proscribed employer-employee relationship between NASA and the Contractor non-civil service employees.

## V. CONCLUSIONS

As observed in the Pellerzi Opinion, a myriad of factors, conditions and circumstances must be balanced and weighed when applying the Pellerzi Elements to each of the 32 contracts determined by the Commission to be within the scope of the Court's November 30, 1973 Order.

Having thus reviewed the Commission's application of the Pellerzi Elements to these contracts, and having further analyzed specific contested conclusions on a contract-by-contract basis, and it appearing that there is no genuine issue as to any material fact, the Court concludes that consistent with the findings of fact and conclusions of law made in this Memorandum Opinion, that, as a matter of law, plaintiffs are entitled to summary judgment with respect to those

---

88. Report On: Service Technology Corporation Contract No. NAS 8–17203, by the U. S. Civil Service Commission, May, 1974, at page 2.

89. Report On: Computing and Software, Inc. Contract No. NAS 8–26034, by the U. S. Civil Service Commission, May, 1974, at page 5.

90. *Id.*, at 6.

91. *Id.*, at 7–8.

support service contracts establishing the proscribed employer-employee relationship; and further, that defendants and intervenor-defendant NCTSI are entitled to summary judgment with respect to those contracts found not to have established said relationship.

 Therefore, regarding those support service contracts upon which they have prevailed, plaintiffs are entitled to judgment: declaring that said contracts are proscribed by 42 U.S.C. § 2473(b)(2) and the Federal personnel laws, and are null and void; enjoining NASA from extending, renewing, or giving further effect to said contracts, and directing NASA to terminate said contracts at the earliest possible date; declaring unlawful the RIF actions which took place in 1967, or thereafter, demoting or discharging Civil Service employees from their positions by reason of the existence of the support service contracts found hereinabove to be null and void; and, directing NASA to cancel any and all such RIF actions, and to reinstate all such Civil Service employees thereby affected to their lawful positions with back pay and employee benefits.

Defendants and intervenor-defendant NCTSI are likewise entitled to judgment declaring lawful the contracts upon which they have prevailed. An Order denying plaintiffs' motion to punish defendants Civil Service Commissioners and their General Counsel for contempt will be entered, the Order to Show Cause dated April 1, 1974 will be dissolved and the Rule discharged.